## Commonwealth vs. Domenic Buccella.

Plymouth. November 7, 2000. - July 9, 2001.

Present (Sitting at Brockton): Marshall, C.J., Greaney, Ireland, Spina, Cowin, & Sosman, JJ.

*Privacy. Search and Seizure,* Expectation of privacy, Student. *Constitutional Law,* Search and seizure. *Evidence,* Handwriting exemplar, School records. *Words,* "Student record."

A high school student charged with violating the civil rights of a teacher and malicious destruction of property, arising out of graffiti on school property containing obscenities and racial slurs, had no expectation of privacy in his handwriting, but had a reasonable expectation of privacy with respect to his school papers, notwithstanding that he had turned them over to his teachers. [476-485] Marshall, C.J., concurring in part and dissenting in part, was of the opinion that the determination whether a student's work product is part of the "student record" under 603 Code Mass. Regs. § 23.02, and therefore subject to the confidentiality requirements of G. L. c. 71, § 34D, and its implementing regulations, turns on whether the student's work, in the words of § 23.02, is "kept" by the school and "organized . . . in a way that such student may be individually identified." [488-492]

In a criminal case involving a high school student charged with violating the civil rights of a teacher and malicious destruction of property, arising out of graffiti on school property containing obscenities and racial slurs, it was reasonable of the school to review the student's school papers and submit them to the police for expert evaluation of the student's handwriting characteristics, and the school's assembling samples of the student's schoolwork and turning them over to the police, if a search, easily passed muster under the requirement of reasonableness under the Fourth Amendment to the United States Constitution. [485-487]

Where there was no illegality in police inspecting handwriting samples to evaluate the handwriting characteristics of a high school student charged with violating the civil rights of a teacher and malicious destruction of property, arising out of graffiti on school property containing obscenities and racial slurs, a judge should have allowed the Commonwealth's motion to obtain other handwriting exemplars from the student [487-488]; further, this court, having ruled that initial handwriting analyses should not have been suppressed, and that the Commonwealth was entitled to additional handwriting exemplars, concluded that the defendant's motion to dismiss, premised on the assumption that, without the handwriting samples and analyses, the Commonwealth would have been unable to proceed with the prosecution, should have been denied [487-488].

Complaints received and sworn to in the Brockton Division of the District Court Department on March 30, 1998.

A pretrial motion to suppress evidence and a motion to dismiss were heard by *David G. Nagle, Jr.,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Gail M. McKenna,* Assistant District Attorney, for the Commonwealth.

*Michael W. Turner* for the defendant.

Sosman, J. The defendant was charged with violating the civil rights of one of his teachers and two counts of malicious destruction of property over $250, all three charges arising out of graffiti on school property that contained obscenities and racial slurs. The evidence identifying the defendant as the perpetrator of these crimes included comparison of the handwriting in the graffiti with the defendant's handwriting in several of his school work papers. At the request of its handwriting expert, the Commonwealth moved to compel the production of witnessed, comprehensive handwriting exemplars for further comparison. The defendant filed a motion to suppress the handwriting samples provided by his high school and a motion to dismiss, claiming that the evidence used to charge him was illegally obtained. A judge in the District Court denied the Commonwealth's motion for production of exemplars and granted the defendant's motion to suppress and his motion to dismiss. The Commonwealth appealed, and we transferred the case to this court on our own motion. For the following reasons, we reverse and remand the matter for further proceedings.

1. *Facts.* The defendant was a student at East Bridgewater High School (high school). During the second semester of the 1996-1997 school year, the defendant had refused to work with his special education teacher, Ms. Shirley Phillips, and had engaged in numerous attempts to disrupt her work in the classroom. The defendant's disruptive behavior included racial slurs directed at Ms. Phillips, making "rude guttural sounds whenever she entered the room," and calling her "Tituba," a reference to a black slave in "The Crucible." Despite warnings, reprimands, and a suspension, the defendant's harassment of Ms. Phillips did not abate.

The incidents at issue in the present case occurred during the first two months of the 1997-1998 fall semester. Sometime

between the end of the school day on Friday, September 5, 1997, and the start of school on Monday, September 8, 1997, racial slurs were written on the blackboard in Ms. Phillips's classroom. While the defendant's prior racial animosity toward Ms. Phillips made him a potential suspect, there were many other persons who had had access to the room over the course of the weekend. Photographs were taken and shown to the faculty to determine whether anyone could recognize the handwriting on the blackboard, but no identification was made at that time.

On October 16, 1997, and again on October 23, 1997, the high school was vandalized with obscene words and wavy lines written on the corridor walls. The East Bridgewater police department and the bureau of criminal investigation (BCI) took photographs of the new vandalism. The school's vice principal informed the police that the defendant had been seen by members of the faculty in the corridor at the time of the October 23 incident.

The vice principal investigated the incidents and, on November 3, 1997, she provided the police with statements from other teachers at the school indicating that, for one of the incidents, the defendant was the only student in the vandalized area of the building who was not in his classroom when the vandalism occurred. She also informed the police that she suspected the defendant because, on the day of the October 16 incident, the defendant had been in her office and had spoken the same words that were later written on the walls.

The vice principal provided the police with samples of school work papers written by the defendant, along with "two other student samples,"[1] requesting that the police conduct a handwriting analysis to determine whether any of the handwriting matched the writing on the walls or the earlier writing on Ms. Phillips's blackboard. The police submitted the samples to an analyst at BCI, who reported the next day that the handwrit-

---

[1]The judge found that these papers were school assignments and tests provided by the vice principal but the record does not specify from where they were obtained. The record also does not identify who the other two students were or why the vice principal might have suspected them in connection with any of these three incidents.

ing in the October 16 and October 23 graffiti matched the defendant's handwriting. Further handwriting analyses were conducted by an independent expert, who confirmed that the defendant was the likely author of the graffiti on the walls and opined that he was also the likely author of the racial slurs on the blackboard. Based on the handwriting analyses, the statements of faculty members, and the defendant's history of offensive behavior directed toward Ms. Phillips, complaints were issued for malicious destruction of property and violation of civil rights.

The defendant filed a motion to suppress the handwriting analyses and samples, claiming that his school papers containing the samples had been illegally obtained by the East Bridgewater police department. Neither the defendant nor his parents had consented to the high school's release of the defendant's school papers to the police, and the police department had not subpoenaed or obtained a warrant for the papers. He also filed a motion to dismiss contending that the evidence used to charge him (i.e., the handwriting comparison) was illegally obtained. The Commonwealth moved for the production of comprehensive handwriting exemplars from the defendant to be taken using the format recommended by its expert. The judge granted the defendant's motion to suppress and motion to dismiss, and denied the Commonwealth's motion for handwriting exemplars.

2. *Expectation of privacy.* In order to suppress the fruits of an allegedly unlawful search, the defendant must first show that there has been a "search," and, to show that he has been subjected to some form of "search," he must show that the police have intruded on a reasonable expectation of privacy. See *Commonwealth* v. *Pina,* 406 Mass. 540, 544, cert. denied, 498 U.S. 832 (1990); *Commonwealth* v. *Simmons,* 392 Mass. 45, 49, cert. denied, 469 U.S. 861 (1984). The defendant has no expectation of privacy in his handwriting, because "[h]andwriting, like speech, is repeatedly shown to the public, and there is no more expectation of privacy in the physical characteristics of a person's script than there is in the tone of his voice." *United States* v. *Mara,* 410 U.S. 19, 21 (1973). With regard to school records, we have held that there is no privilege protecting such records from disclosure or restricting the use of such records as

evidence at trial. See *Commonwealth* v. *Beauchemin*, 410 Mass. 181, 185 (1991) (defendant subpoenaed school records of complaining witness; error to exclude records at trial).

To support his claimed expectation of privacy in his school papers, the defendant points to regulations protecting the confidentiality of "student records." Pursuant to G. L. c. 71, § 34D, the Department of Education (department) has promulgated regulations regarding the maintenance of records at public elementary and secondary schools.[2] See 603 Code Mass. Regs. § 23.00 (1995). The purpose of these regulations is "to insure parents' and students' rights of confidentiality, inspection, amendment, and destruction of student records and to assist local school systems in adhering to the law." 603 Code Mass. Regs. § 23.01.

Pursuant to the regulations, high school students and their parents have free access to their own "student records." However, third persons may only access "student records" with written consent from the student or the student's parents, unless one of several exceptions identified in the regulations applies and permits release of the records. 603 Code Mass. Regs. § 23.07(4).[3] Here, the school did not obtain the consent of the defendant or his parents before disclosing the defendant's papers

---

[2]General Laws c. 71, § 34D, provides in relevant part: "The board of education shall adopt regulations relative to the maintenance, retention, duplication, storage and periodic destruction of student records by the public elementary and secondary schools of the commonwealth." The statute does not set forth any express requirement of confidentiality.

[3]Under one such exception, a third party may access "student records" without consent by obtaining a "court order or lawfully issued subpoena," but the school must still make "a reasonable effort to notify the parent or eligible student of the order or subpoena in advance of compliance." 603 Code Mass. Regs. § 23.07(4)(b). The exception is not applicable, as there was no warrant or subpoena issued in this case.

The Commonwealth contends that the school was permitted to release the papers pursuant to an exception allowing a school to "disclose information regarding a student to appropriate parties in connection with a health or safety emergency if knowledge of the information is necessary to protect the health or safety of the student or other individuals." 603 Code Mass. Regs. § 23.07(4)(e). As worded, the exception applies only when there is a threat to the health or safety of persons. The exception would not extend to cases of property damage, and, while the obscenities and racial slurs were profoundly offensive to Ms. Phillips and others, they did not threaten anyone's health or safety.

to the police, nor did the police obtain a warrant or a subpoena for these items. Consequently, if we determine that these assignments are "student records," the release of the papers to a third party would be a violation of the regulations governing such records.

The regulations define the term "student record" as "the transcript and the temporary record, including all information . . . or any other materials regardless of physical form or characteristics concerning a student that is organized on the basis of the student's name or in a way that such student may be individually identified, and that is kept by the public schools of the Commonwealth." 603 Code Mass. Regs. § 23.02. The term "transcript" is defined as "administrative records that constitute the minimum data necessary to reflect the student's educational progress" and is limited to information identifying the student (name, date of birth, address, telephone number, names and addresses of parents) and course titles, grades, course credits, grade level completed, and the date of completion. *Id.* The "temporary record" is defined as "all the information in the student record which is not contained in the transcript." *Id.* Items in the "temporary record" must be "clearly . . . of importance to the educational process," including "standardized test results, class rank (when applicable), extracurricular activities, and evaluations by teachers, counselors, and other school staff." *Id.*

The defendant contends that his written assignments and tests are part of his "student record" because they are "organized on the basis of [his] name or in a way that [he] may be individually identified," and, while in the school's possession, are "kept" by the school. 603 Code Mass. Regs. § 23.02. The defendant also notes that the definition of "student record" is broad, and there is nothing expressly excluding homework or classroom tests from the definition. The defendant invokes the provision that the regulations "should be liberally construed" for the purpose of "insur[ing] parents' and students' rights of confidentiality, inspection, amendment, and destruction of student records." 603 Code Mass. Regs. § 23.01. Thus, the defendant concludes that every one of his homework assignments, tests, quizzes, and other written pieces of school work

were part of his "student record" and could not be disclosed without his consent or the consent of his parents.

The defendant's interpretation of the regulations is based on a literal reading of selected phrases from the ambiguous and circular definitions of the terms "student record" and "temporary record."[4] However, looking at the definitions in their entirety, and in the context of the regulatory scheme as a whole, we are not persuaded that the department intended the term "student record" to include every piece of written work handed in by a student. First, because homework, tests, class assignments, and the like are not part of the student's "transcript," they can only be part of the "student record" if they are in the "temporary record," which may include such items as "standardized test results, class rank[,] . . . extracurricular activities, and evaluations." Homework, class work, quizzes, and classroom tests have nothing in common with the examples listed. We also note that the listed examples are typically maintained in a central file on the student, whereas homework assignments, tests, and quizzes are typically handed in to teachers, graded, and returned to the students. The papers themselves are only briefly in the school's possession; all that is "kept" by the school is the resulting grade.[5]

Moreover, the broad interpretation of the regulations suggested by the defendant would prevent the use of student work

---

[4]Where the "student record" consists of "the transcript and the temporary record," and the "temporary record" is defined as "all the information in the student record which is not contained in the transcript," 603 Code Mass. Regs. § 23.02, there is no definition of what, other than the "transcript," comprises a "student record."

[5]The dissent suggests that, if student work is sent in to the student's file, it is then "kept" by the school and takes on the confidential characteristics of the "student record." *Post* at 488-490. The regulations suggest that such materials do not belong in the student's file at all. What is to be kept in the "student record" is the "transcript," which does not include student written work, and the "temporary record," consisting of such items as "standardized test results, class rank (when applicable), extracurricular activities, and evaluations by teachers, counselors, and other school staff," items that have nothing in common with the student's written work. 603 Code Mass. Regs. § 23.02. The "temporary record" is to be reviewed periodically, and items that do not belong there are to be removed. 603 Code Mass. Regs. § 23.06(2). Ultimately, once the student is no longer attending the school, the "temporary record" is to be destroyed, leaving only the "transcript" itself as the entirety of the "student record." 603 Code Mass. Regs. § 23.06(3). Under this scheme, it

for ordinary teaching purposes. A "third party" may not access any "information in or from a student record" without "informed written consent of the eligible student or the parent," 603 Code Mass. Regs. § 23.07(4), and the term "third party" is defined as "any person . . . other than the eligible student, his/her parent, or authorized school personnel." 603 Code Mass. Regs. § 23.02. Because the term "eligible student" is defined as a student who is at least fourteen years old or has entered the ninth grade (603 Code Mass. Regs. § 23.02), students in elementary schools, middle schools, and junior high schools are not "eligible students," and are therefore not allowed to access their own "student records" or consent to the release of any portion of their "student records." If all homework and test papers are part of the "student record," teachers could not even hand corrected or graded assignments back to elementary, middle or junior high school students without written consent

does not appear that a student's own written work is to be sent to the student's file or "kept" by the school at all.

Whether things that are not supposed to be part of the "temporary record" become so if they are inappropriately sent to the student's file may pose an interesting hypothetical under these definitions of "student record" and "temporary record," but classifying everything as part of the "student record" merely because of its placement in the student's file can lead to some absurd results. (For example, if someone puts in a student's file a copy of the program from the school play in which the student starred, or a newspaper clipping concerning that student's activities or achievements, does that publicly distributed program or newspaper article suddenly become confidential merely because it is now located in the student's file?) The dissent's analysis would make the confidentiality of the student's work hinge on where the student paper was located. *Post* at 488-489. If students have privacy interests in their own written work, those privacy interests should not be greater or lesser depending on whether the written work is in a teacher's briefcase to be handed back the next day or in a file in the principal's office. Given that we are interpreting ambiguous and circular definitions of the terms "student record" and "temporary record" (see note 4, *supra*), there is no need to interpret them in a way that would have such puzzling consequences.

To the extent that, as the dissent suggests, the critical issue is whether the written papers in this case were "kept" in the defendant's file, we agree that the defendant produced no evidence on that issue. The defendant, who had the burden of showing that his reasonable expectation of privacy had been invaded by a violation of these regulations, made no showing as to how or from where his writing samples had been retrieved, and thus no showing that they had been "kept" in some central file on him prior to their transmittal to the police.

from each student's parent. An interpretation of the term "student record" that prevented teachers from reviewing a student's work with the student in question, or even returning papers, quizzes, and tests to the student, would be utterly absurd and is clearly not what the department intended.[6]

Other standard teaching practices would be forbidden under the defendant's proposed interpretation of "student record." A teacher could not post a student's work on a bulletin board, or read a student's essay aloud in class, without the "specific, informed written consent" of either an "eligible student" or a parent. 603 Code Mass. Regs. § 23.07(4). For younger students in grade levels lower than ninth grade, teachers would have to contact a student's parent to obtain written permission to share the student's work with the rest of the class for educational purposes. Even display of work as a form of recognition, reward, or encouragement would be prohibited unless the parent were first notified and gave written consent. For example, an elementary school art teacher could not display student artwork in the classroom without first obtaining separate written permission from a parent.

Other features of the regulatory requirements pertaining to "student records" would, if applied to routine homework assignments, quizzes, and tests, be absurdly cumbersome. For example, when parents, students, or third parties access a "student record," that access must be recorded in a detailed log.

[6]Even with regard to older "eligible" students, the regulations would, if interpreted as the defendant suggests, interfere with the ordinary return of assignments to the student. The regulations require that, while a student is enrolled at the school, the school principal "shall periodically review and destroy misleading, outdated, or irrelevant information contained in the temporary record," but must give prior written notice to both the student and the student's parents and give them an opportunity to retrieve or copy the material prior to its destruction. 603 Code Mass. Regs. § 23.06(2). School teachers routinely hand homework assignments, tests, and quizzes back to students (and thereby, if they are part of the "temporary record," remove them from the student's "temporary record") without prior written notification to each student's parent. Requiring teachers to notify parents, in writing, every time they are about to return corrected student work to high school students would be as inane as requiring written parental consent before handing student papers back to elementary and junior high school students.

603 Code Mass. Regs. § 23.07(1).[7] It seems reasonable for the school to keep a log of those who access a student's school file, as one can readily maintain a log sheet in the front of the file listing those who have accessed the file. But it would be burdensome in the extreme for each teacher to keep individual logs of access for each homework assignment, test, quiz, and essay for each student. Teachers usually organize their papers by assignment, not by student, e.g., a stack of quizzes or a stack of book reports. If these assignments were included in the "student record," the teacher would have to keep a log of access for each assignment, or keep a general log for each student to be updated when anyone accessed any of a number of stacks of assignments. A teacher would be required to make detailed entry in the log (see note 6, *supra*) every time that a student's work was displayed or read aloud, and, for younger students, every time their written work was handed back to them (after obtaining the written consent described above).

Similarly, the regulations require careful entries whenever an item is added to a student's "temporary record." After specifying that information in the student record "shall be limited to information relevant to the educational needs of the student," the regulations go on to require that "[i]nformation and data added to the temporary record shall include the name, signature, and position of the person who is the source of the information, and the date of entry into the record." 603 Code Mass. Regs. § 23.03. If teachers must treat every student paper as part of the "student record," teachers would have to be making an entry in each student's record every time they collected homework assignments, quizzes, or classroom tests.

In light of the multiple layers of absurd consequences that would result from the defendant's proposed interpretation of "student record" and "temporary record," many of them inimical to ordinary teaching practices, we do not interpret these ambiguous definitions as including homework, written class-

[7]The detail to be included in the log consists of the name, position, and signature of the person releasing the information; the name, position, and affiliation of the person receiving the information; the date of access; identification of the portions of the record that were released; and the purpose for which access was allowed. 603 Code Mass. Regs. § 23.07(1).

work, classroom tests, or quizzes. We do not believe that the department intended to interfere with the normal process of returning corrected and graded work to students or to cripple that process with burdensome paperwork requirements. If the department wishes to protect these items, it may of course do so by appropriate regulation, but the regulations in their current version show no such intent on the part of the department.[8]

While we conclude that homework and the like do not come within the definition of "student record," and thus are not protected by the confidentiality provisions of the regulations, we must also consider whether, on any other basis, the defendant would still have a reasonable expectation of privacy in his schoolwork. A student would, even without reference to the

---

[8]The defendant also contends that his papers were protected under the Family Education Rights and Privacy Act of 1974 (FERPA), which imposes requirements on educational institutions receiving Federal funds. 20 U.S.C. § 1232g(a), (b), and (e) (1994). FERPA defines protected "education records" as all records that "contain information directly related to a student" and "are maintained by an educational agency or institution." 20 U.S.C. § 1232g (a)(4)(A). (Unlike the Massachusetts regulations, FERPA contains no definitions of or limitations on what sorts of items may be placed in an "education record," but rather makes any information that is "maintained" concerning a student part of that student's "education record.") The reference to records that are "maintained" by the school suggests that this definition does not include student papers or tests that are only briefly held by a teacher for correction and grading. The defendant has not cited any case that extended the protections of FERPA to a student's written work product. Implicitly, the United States Court of Appeals for the Tenth Circuit is of the view that the papers themselves are not "education records." In *Falvo* v. *Owasso Indep. Sch. Dist. No. I-011,* 233 F.3d 1203, 1212-1218 (10th Cir. 2000), cert. granted, 69 U.S.L.W. 3481 (June 26, 2001), the court held that the practice of having students grade each other's papers and announce the grades in class violated FERPA because the grades themselves were part of the "education record." In its extended discussion as to why the announced grades were, even prior to their entry in any record, an "education record," the court at no point even suggested that the papers themselves were part of the "education record" or that the practice of having students read each other's papers had violated FERPA. *Id.* Moreover, FERPA is not violated unless a school has a "policy or practice of permitting the release of education records" without parental consent. 20 U.S.C. § 1232g (b)(1). A single instance of releasing a record without parental consent (which is all that is alleged here) is not a violation of FERPA. See *Achman* v. *Chisago Lakes Indep. Sch. Dist. No. 2144,* 45 F. Supp. 2d 664, 674 (D. Minn. 1999) (finding no FERPA violation where plaintiff alleged only one incident of school releasing records without parental consent).

regulations, reasonably expect that any written work handed in to a teacher would be used solely for educational purposes, i.e., that the teacher would review, correct, and grade the paper or test and return it to the student. A student would not expect, for example, that a teacher would turn over copies of student homework, papers, tests, or quizzes to the media.

A mere expectation that the person to whom an item is entrusted will use it for limited purposes and not reveal it to others does not give rise to a reasonable expectation of privacy recognized under the Fourth Amendment to the United States Constitution. In *United States* v. *Miller*, 425 U.S. 435 (1976), the Court held that the defendant had no reasonable expectation of privacy in his bank records, notwithstanding his expectation that the bank would not disclose such information. "[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *Id.* at 443. Relying on *Miller*, we have held that a defendant had no reasonable expectation of privacy in telephone message records when the taking of those messages had been entrusted to an outside service. *Commonwealth* v. *Cote*, 407 Mass. 827, 833-836 (1990).[9]

Here, we note that the items were turned over to a governmental entity (the public high school), not to a private third party. We also note that school attendance is compulsory, G. L. c. 76, § 1, and that students handing in schoolwork to their teachers are not doing so in a manner that is entirely voluntary.[10] It is unclear whether the principles of *United States* v. *Miller, supra,*

_____

[9]We did recognize that analysis of an expectation of privacy following entrustment to a third party might be different under art. 14 of the Massachusetts Declaration of Rights: "It may be that under art. 14 exposure of information to another party might not compel the rejection of a claim of a reasonable expectation of privacy, particularly in light of the fact that the third party here, [the message service], considered the telephone message records to be confidential." *Commonwealth* v. *Cote*, 407 Mass. 827, 835 (1990). In the present case, the defendant's arguments were based exclusively on the Fourth Amendment, not on art. 14.

[10]The defendant was seventeen years old at the time of these events and was thus no longer required to attend school. See G. L. c. 76, § 1, as appear-

would apply when the items are entrusted to a government entity, under some degree of compulsion, for a limited purpose that would not normally entail disclosure to others. It would appear reasonable to expect that a government agency, to which a citizen is required to submit certain materials, will use those materials solely for the purposes intended and not disclose them to others in ways that are unconnected with those intended purposes. Thus, a student may reasonably expect that papers handed in to public school teachers will be used solely for educational purposes and not disclosed outside the educational setting. While holding that school records are not literally privileged (as they may be obtained by means of a mere subpoena), we have nevertheless recognized that there are privacy interests at stake in school records and held that G. L. c. 4, § 7, Twenty-sixth (*c*), exempts such materials from public disclosure under G. L. c. 66, § 10. *Commonwealth* v. *Beauchemin*, 410 Mass. 181, 185 (1991). For purposes of this case, we shall thus assume that the defendant· had a reasonable expectation of privacy with respect to his school papers, notwithstanding the fact that he had turned them over to his teachers.

3. *Reasonableness of the search.* Assuming that the defendant had a reasonable expectation of privacy with respect to his written schoolwork while in the school's possession, the school's assembling samples of that work and turning them over to the police would qualify as a form of search. The Fourth Amendment applies to searches by school officials in public schools. *New Jersey* v. *T.L.O.*, 469 U.S. 325, 333 (1985). *Commonwealth* v. *Snyder*, 413 Mass. 521, 527-528 (1992). While recognizing that school officials are subject to the Fourth Amendment, courts have also acknowledged the "substantial need of teachers and administrators for freedom to maintain order in the schools." *New Jersey* v. *T.L.O.*, *supra* at 341, and have thus attempted to balance "the schoolchild's legitimate expectations of privacy and the school's equally legitimate need to maintain an environ-

ing in St. 1965, c. 572, § 36. See also St. 1965, c. 741. However, for most students, attendance is required, and the reasonable expectation as to how school officials will use student papers does not change the moment the student reaches age sixteen.

ment in which learning can take place." *Id.* at 340. To that end, school officials are not required to obtain a search warrant prior to conducting a search in school.[11] *Id. Commonwealth* v. *Snyder, supra* at 528.

The Fourth Amendment also does not require that school officials have probable cause prior to a search. Instead, school officials need only act reasonably in all the circumstances. *New Jersey* v. *T.L.O., supra* at 341. *Commonwealth* v. *Carey,* 407 Mass. 528, 533 (1990). School officials need not "meet the standard of probable cause." *Id.* In order to determine whether a search was reasonable, a court must determine (1) whether the "action was justified at its inception," and (2) "whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.' " *New Jersey* v. *T.L.O., supra,* quoting *Terry* v. *Ohio,* 392 U.S. 1, 20 (1968). A search is justified at its inception "when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *New Jersey* v. *T.L.O., supra* 342. The standard of reasonable suspicion does not require absolute certainty, but only "sufficient probability," "the sort of 'common-sense conclusio[n] about human behavior' upon which 'practical people' — including government officials — are entitled to rely." *Id.* at 346, quoting *United States* v. *Cortez,* 449 U.S. 411, 418 (1981). A search is reasonably related in scope "when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *New Jersey* v. *T.L.O., supra* at 342.

The search conducted here easily meets this standard of reasonableness. It was reasonable to suspect the defendant in connection with these crimes, and the inspection of papers he had turned in to school teachers was a minimal intrusion. Indeed, the only inspection being conducted was of the

---

[11]A warrant would be required if school officials conducted a search "explicitly acting on behalf of law enforcement officials." *Commonwealth* v. *Snyder,* 413 Mass. 521, 528 (1992). Here, the vice principal conducted her own investigation and volunteered the defendant's handwriting samples. The police did not request that the school provide copies of any suspect's schoolwork.

handwriting characteristics displayed on the papers, not their substantive content or academic merit. Given that there is no reasonable expectation of privacy with respect to handwriting itself, *United States* v. *Mara*, 410 U.S. 19, 21 (1973), the scope of the inspection was limited to a subject that was not even private, and any observations beyond the characteristics of the handwriting were purely incidental.[12]

Assessment of the reasonableness of the school's conduct here must also recognize that the school itself was the victim of these particular ongoing crimes, and was, like any victim, seeking to assist the police in solving the crimes and preventing further recurrences. While the school may have had some general obligation to use student papers only for educational purposes, it had a clear obligation to prevent further racial harassment of a faculty member and further physical damage to the public school premises. Where a student's school papers likely contained evidence pertinent to ongoing disruptive conduct at the school, it was reasonable of the school to review those papers and submit them for expert evaluation by the police. This search, if it was a search, easily passes muster under the Fourth Amendment requirement of reasonableness.[13]

4. *Handwriting exemplars.* The Commonwealth contends that the motion judge erred in denying its motion for further handwriting exemplars. The defendant contends that the motion for handwriting exemplars was properly denied because the exemplars would be fruit of the poisonous tree. The fruit of the

[12]The substantive contents of the papers did not add to the evidence against the defendant, and they are not even described in any of the police reports.

[13]The defendant did not make any claim that the inspection of his papers violated art. 14. We have previously refrained from deciding whether art. 14 imposes a stricter standard for school searches than the reasonableness standard imposed by Fourth Amendment, but have held that art. 14 does not impose on school officials any standard higher than probable cause to conduct a search. *Commonwealth* v. *Snyder, supra* at 529. Here, where the defendant was the only person who had the opportunity to commit one of the incidents of vandalism, the words used in the graffiti were identical to words spoken by the defendant earlier the same day, and the defendant's prior harassment of Ms. Phillips had included the use of racial slurs, there was probable cause to search the defendant's school papers for purposes of comparing his handwriting to the handwriting on the walls and blackboard. Framing the defendant's claim as a violation of art. 14 would not affect the outcome we reach today.

poisonous tree doctrine is properly invoked when evidence, although legally obtained, is derived from an illegal source. See *Commonwealth* v. *Fredette*, 396 Mass. 455, 459 (1985). As discussed above, there was no illegality in inspecting the handwriting samples, and evidence from those inspections should not have been suppressed. Thus, there is nothing to taint the Commonwealth's obtaining other handwriting exemplars from the defendant. The motion for handwriting exemplars should have been allowed.

5. *Motion to dismiss.* The defendant's motion to dismiss was also premised on the assumption that the handwriting samples and analyses were illegally obtained, and that, without that evidence, the Commonwealth would be unable to proceed with the prosecution. Having ruled that the initial handwriting analyses should not have been suppressed, and that the Commonwealth is entitled to further handwriting exemplars, we conclude that the motion to dismiss should have been denied.

6. *Conclusion.* The judgments dismissing the complaints are vacated. The case is remanded to the District Court for further proceedings consistent with this opinion.

*So ordered.*

MARSHALL, C.J. (concurring in part and dissenting in part). I join in the opinion of the court in all respects but one. The court concludes, incorrectly in my judgment, that "homework, written classwork, classroom tests, or quizzes" are never "student records" under 603 Code Mass. Regs. § 23.02 (2000). *Ante* at 482-483. In my view, a determination whether a student's work product is part of the "student record," and therefore subject to the requirements of G. L. c. 71, § 34D, and its implementing regulations, 603 Code Mass. Regs. § 23.00 (2000), turns initially on whether that work is "kept" by the school and is "organized . . . in a way that such student may be individually identified." 603 Code Mass. Regs. § 23.02. I agree with the court that in this case the defendant may not invoke the protections of the provisions of the statute and regulations. He may not do so because he has made no showing (as he must) that school officials "kept" the school work papers at issue.

Assignments that are submitted by a student, graded by an

instructor, and returned to the student serve an evanescent pedagogical purpose: They are not part of the "student record" under the department's regulations because the school does not "keep" them in its files. 603 Code Mass. Regs. § 23.02. On the other hand, a school may retain in its central or other administrative files all nature of student work (in addition to transcripts) that records a student's academic trajectory.[1] These materials are part of the "temporary record" if they are "organized . . . in a way that [the] student may be individually identified," are "kept by the public school" and have clear "importance to the educational process."[2] *Id.* In light of the department's instruction that its regulations "to insure parents' and students' rights of confidentiality . . . should be liberally construed," 603 Code Mass. Regs. § 23.01, I cannot subscribe to the court's holding that the Legislature and the department intended to exclude categorically a student's own work from statutory protection simply because in some (or even most) circumstances, that type of material would be returned to the student or shared with other students.

This is not to suggest that all student work that is placed in a school's central or other administrative files automatically becomes part of the "temporary record" because of its location. The regulations establish that the "temporary record" includes only that information, "regardless of physical form," that meets the three previously identified regulatory criteria. 603 Code Mass. Regs. § 23.02. There is no conceivable way that the regulations would protect from disclosure, for example, newspaper clippings, programs from school plays, *ante* at 479 n.5,

[1]There is nothing in the record to support the court's statement as to what is "typically" maintained by schools in a "central" student file, nor is there any support for the statement that "*all* that is 'kept' by the school is the resulting grade" (emphasis added). *Ante* at 479.

[2]Because student work papers in some circumstances satisfy these three criteria, I do not subscribe to the court's conclusions that student work product has "nothing in common" with the information that the regulations suggest may be included in the "temporary record"; that student papers are "not supposed to be part of the 'temporary record'" under the department's regulatory scheme; or that student papers therefore will be "kept" in a central school file only when they are improperly placed there and school officials neglect to destroy them in the course of periodic file management pursuant to 603 Code Mass. Regs. § 23.06(2). *Ante* at 479 n.5.

or any other individually identifiable materials that happen to be located in a student's central file, but are not of "importance to the educational process." 603 Code Mass. Regs. § 23.02.

Because the inquiry must be directed initially to whether a student's written work is "kept" in a school's administrative files, there is also no possibility that the statute or regulations will interfere with a teacher's use of that work in the course of "ordinary teaching practices," *ante* at 482, nor would there be any "absurdly cumbersome" requirements placed on school officials to log the submission and return of that work. *Ante* at 481. Student work product utilized in the manner the court suggests, *ante* at 482, is plainly not "kept" by the school and therefore may be disclosed without violating the statute or regulations.

It is contrary to the plain language of the regulation to conclude, as the court does, that the protection accorded to certain student information under the regulations should never take into account the location of that information. *Ante* at n.5. While, as a general proposition, information and materials that meet the regulations' definitional requirements are part of the "student record . . . regardless of where they are located," 603 Code Mass. Regs. § 23.02, the department has made clear that whether certain information is part of the "student record" does turn, in part, on its locus and in what manner it is "kept." For example, the department has provided that the term "student record" does not include "notes, memory aids and other similar information that is maintained *in the personal files of a school employee* and is *not accessible or revealed* to authorized school personnel or any third party" other than the student, a parent, or a substitute of the record's maker (emphasis added). 603 Code Mass. Regs. § 23.04. Such information may become part of the "student record," however, if it is "released to authorized school personnel." *Id.*

For these same reasons, I agree with the court that the definition of "education records" under the Family Educational Rights and Privacy Act of 1974 (FERPA) does not include student papers or tests that are "briefly" held by a teacher for correction and grading. *Ante* at 483 n.8. I do not agree with the court's suggestion that FERPA protections can never extend to homework, classroom tests and other student work product. *Id.*

As a number of courts have observed, the language of the Federal statute reveals that "Congress intended for the definition of education records to be broad in its scope." *Belanger* v. *Nashua, Sch. Dist.*, 856 F. Supp. 40, 48 (D.N.H. 1994). See *United States* v. *Miami Univ.*, 91 F. Supp. 2d 1132, 1149 (S.D. Ohio 2000). A student's school papers need only be "maintained" by an educational institution and contain "information directly related to [the] student" to garner the protection of the statute. 20 U.S.C. § 1232g(a)(4)(A). Under this broad mandate, FERPA covers all those aspects of a student's educational life that "relate to academic matters or status as a student," regardless of the medium in which the material is presented. 5 J.A. Rapp, Education Law § 13.04[4][a] (2000). See *Bauer* v. *Kincaid*, 759 F. Supp. 575, 591 (W.D. Mo. 1991) (in accord with its function to protect "educationally related information," FERPA "expressly protects . . . records relating to individual student academic performance").

The legislative history of the Federal statute, on which the Massachusetts statute and regulations are patterned, supports this broad interpretation of "education records." Congress intended to provide expansive protection to all personally identifiable materials that a school "maintains" on a student. Congress's Joint Statement in Explanation of the Buckley/Pell Amendment, 120 Cong. Rec. 39,862 (1974), explains that to "protect [an] individual['s] right to privacy . . . [the] individual should be able to know, review, and challenge all information — with certain limited exceptions — that an institution keeps on him, particularly when the institution may make important decisions affecting his future, or may transmit such personal information to parties outside the institution."[3] The legislative record of FERPA also makes clear that the statute protects from

[3]None of the listed exceptions applies to a student's written work. In summary, FERPA protections do not extend to (1) records of teachers or administrators that are in the possession of the record's maker or a substitute teacher; (2) law enforcement records; (3) employment records; (4) records of medical or psychological treatment; or (5) records that contain only information about an individual after he or she is no longer a student at that agency or institution. 34 C.F.R. § 99.3 (2001). The statute also specifically exempts "directory information," which includes a student's name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic

disclosure not just a student's IQ scores and grades but also "soft data" collected by the school that might contain untrue or embarrassing information about the student or his family.[4] 120 Cong. Rec. 13,951-13,953 (1974). Many student assignments and other student work papers contain personal information and personal expressions. It would plainly contravene the purpose of FERPA to permit an educational institution to disclose to third parties copies of a student's written assignments that have been "maintained" in the student's administrative file.

---

teams, dates of attendance, degrees and awards received, and the most recent previous educational agency or institution attended by the student. 20 U.S.C. § 1232g(a)(5)(A). See 5 J.A. Rapp, Education Law §§ 13.04[4][b], § 13. 04[8][a] (2000).

[4]Teachers' comments, reports on interviews with parents, and student personality rating profiles are cited as examples of "soft data" that fall within the statute's protection. See 120 Cong. Rec. 13,953 (1974). See also 5 J.A. Rapp, *supra* at § 13.04[4][a].