Billings, Thomas P., J.
For the reasons that follow, Defendant’s Motion to Suppress Jail Calls is DENIED.
FINDINGS OF FACT
An evidentiary hearing was held on May 15 and 16, 2008, at which I heard testimony from two witnesses— Trooper Kevin Baker from the Massachusetts State Police, and Daniel Finn, Deputy in Charge of the Middlesex County Sheriffs Investigation Unit — and received certain exhibits. Based on the credible evidence and reasonable inferences drawn therefrom, I make the following findings of fact.
1. In June of 2006 Tpr. Baker, assigned to the Middlesex Detectives Unit of the State Police, was investigating a double homicide committed in Massachusetts on March 13, 2006. The investigation had led to the arrest of the defendant (“Fitzpatrick”), who was being held pending rendition in the Carroll County (New Hampshire) House of Correction (herein, the “CCHOC”).
2. Tpr. Baker called the CCHOC and spoke with a Major Topsham. He inquired about getting copies of any calls made by Fitzpatrick from the CCHOC. Major Topsham said he needed a written request on State Police stationery.
3. Tpr. Baker sent such a request on June 13, 2006 and in due course received back a compact disk with recordings of Fitzpatrick’s calls.
4. Tpr. Baker has listened to the recordings. I listened to the first few seconds of the first call. It begins with a recorded message, as follows:
You have a collect call from Sean Fitzpatrick at the Carroll County House of Correction. This call may be monitored or recorded.
This same recorded message was played at the beginning of each call that Fitzpatrick placed from the CCHOC. It was audible to him, and to the person on the other end of the call.[1]
5. Somewhat later, the CCHOC sent Baker a copy of a form, signed by Fitzpatrick, titled “Inmate Telephone ID Number Release Form.” I infer from its content, and therefore find, that the form was presented to Fitzpatrick, and that he signed it, before he was permitted to make his first telephone call from the CCHOC.
6. The form calls itself an “agreement” between Fitzpatrick and the Carroll County Department of Correction, and states that Fitzpatrick has been issued a Telephone ID number, to be used to access the Inmate Telephone System and to debit his account for telephone calls and/or commissary orders. There are rules for its use (keeping it confidential; preventing unauthorized use and refraining from unauthorized use of another inmate’s number; no right to reimbur *133 sement for unauthorized use, and so on). The last paragraph states:
I understand and agree that telephone calls are subject to monitoring, recording, and may be intercepted or divulged.
7. Tpr. Baker made a second written request to the CCHOC on July 10, 2006, and received a second CD. He has listened to this recording too. Each of the calls begins with the same recorded message quoted in paragraph 4, supra.
8. At some point, Fitzpatrick was rendited to Massachusetts and housed in the Cambridge Jail. Upon learning this, Tpr. Baker contacted the Middlesex County Sheriffs Department, and spoke to Deputy Daniel Finn. He requested copies of any recordings of telephone calls made by Fitzpatrick from the jail. These were provided, in response to this and subsequent requests; there are four CDs in all.
9. The Sheriffs system for recording inmates’ and detainees’ calls is controlled by computer. To access the calls of a particular detainee Deputy Finn enters the detainee’s PIN. The software then searches for all calls made using that PIN, except those to telephone numbers listed as attorneys or clergy.[2] This was the procedure the Deputy used in responding to each of Tpr. Baker’s four requests. He handed the disks over to Tpr. Baker in person each time.
10. Part of Deputy Finn’s job description includes monitoring of detainee/inmate calls to look for threats to the safety and security of the institution. In that connection he has listened to various calls by Fitzpatrick, selected at random. He did not hear in them anything of interest from the standpoint of institutional security.
11. Tpr. Baker has listened to the Cambridge Jail recordings. As with the CCHOC recordings, I listened to the first few seconds of the first call on the first CD. It begins with a recorded message, as follows:
Hello. This is a collect call from [Male voice: “Sean”), an inmate at the county jail. [Instructions on how the recipient may accept the call.) This call is subject to monitoring and recording.
This same recorded message was played at the beginning of each call that Fitzpatrick placed from the Cambridge jail. It was audible to him, and to the person on the other end of the call.[3]
12. Also in evidence is a Middlesex Sheriffs Department form titled “Cambridge Jail, Detainee’s List of Designated Telephone Numbers,” bearing the date June 21, 2006 and Fitzpatrick’s signature. In addition to the detainee’s “CIN” and “PIN,” there is space for up to eight names and telephone numbers of persons whom the detainee is authorized to call, in addition to three more persons designated as “Attorney/Lawyer/Law Firm/Clergy.” Fitzpatrick listed eight persons in the first section, denoting each as a “Friend,” and his trial counsel in the second. Just before the signature line appears the following:
Your acceptance of the PIN and use of the inmate telephones will be deemed as consent to the conditions and restrictions placed upon inmate telephone calls, including call monitoring, recording, three way calling.
13. The Middlesex Sheriffs Department has promulgated “Policy and Procedure 482 — Telephone Access and Use,” which has been in effect at all material times. Its content is not made known to detainees, but it outlines the procedures followed in this case for PIN usage, designation of attorney/clergy numbers and other numbers, etc. It specifies that calls to numbers designated as attorneys or clergy will not be monitored or recorded.[4] The policy does not address the question of to whom, or under what conditions, telephone recordings may be provided to persons outside the Sheriffs Department.
14. One of the “Friends” on Fitzpatrick’s list of phone numbers is David Spears. Tpr. Baker has interviewed Spears — he does not recall precisely when— and learned that Spears had had several telephone conversations with Fitzpatrick, while the latter was in custody, concerning the events of March 13, 2006. Fitzpatrick gave conflicting accounts to Spears concerning his movements on that morning. Spears reported to Baker that in one conversation, he confronted Fitzpatrick concerning the inconsistencies, asking him, “What’s really the truth?”
15. Upon listening to the recordings of Fitzpatrick’s telephone calls from the CCHOC and the Cambridge Jail, Tpr. Baker was able to confirm the accuracy of Spears’s description of them. It appeared to Baker that Fitzpatrick was making an effort to establish, in recorded calls, that his movements on the day of the murders were inconsistent with his having traveled to Wakefield and back that morning.
16. Baker also noted a number of occasions on which Fitzpatrick acknowledged, in his telephone conversations from the CCHOC and the Middlesex jail, that the calls were “bugged.” In one of the CCHOC conversations he told the person he had called, “I need to be careful what I say on these phones.”
17. There is no evidence that Fitzpatrick was ever told, during the timeframe in question,[5] that the recordings of his telephone calls from either CCHOC or the Cambridge jail would or could be shared with police or other law enforcement, or otherwise used in the investigation or prosecution of the murders for which he was being held. Conversely, there is no evidence that he was told that this would not happen, or that the purpose of monitoring and/or recording his calls was limited to matters relating to the security of the institution and other strictly penological aims.
18.1 find, as a matter of fact, that Fitzpatrick knew that his calls were being recorded and might be mon *134 itored. I further find that he did not have any actual, subjective expectation that the recordings, or any information picked up in monitoring, would be withheld from law enforcement, or kept “off limits” in the investigation and prosecution of the murder case.
DISCUSSION
A. Due Process
Fitzpatrick first maintains that the practice by which a district attorney’s office, with or without a subpoena but without a judicial hearing, obtains from the sheriff recordings of calls that the defendant/detainee has made while in custody violated his right to due process under the Massachusetts and United States constitutions.
A handful, at least, of decisions from this Court have considered this practice, which seems to be increasingly widespread. The results have not been uniform.[6] My own analysis of the issue is as follows.
1.Due Process Behind Bars
Both the Fourteenth Amendment to the U.S. Constitution and Art. 12 of the Declaration of Rights forbid — the former succinctly, the latter more expansively — the deprivation of a person’s liberty or property without due process of law. The cases under both Constitutions are clear that these rights are not surrendered at the door of a jail, house of correction, or prison. Turner v. Safley, 484 U.S. 78, 84 (1987); Torres v. Commissioner of Corrections, 427 Mass. 611, 617 (1998).
These cases also recognize, however, that a jail or correctional institution may adopt regulations which restrict a detainee’s or inmate’s rights beyond what would be tolerated on the outside, provided the restrictions are “reasonably related to a legitimate penological interest.” Massachusetts Prisoners Ass’n Political Action Committee v. Acting Governor, 435 Mass. 811, 820 (2001).
2.Monitoring and Recording of Detainee/Inmate Telephone Calls
In Cacicio v. Secretary of Public Safety, 422 Mass. 764 (1996), the SJC considered, and rejected, a facial challenge to Department of Correction regulations governing inmate use of telephones in the Massachusetts correctional system, and permitting DOC monitoring and recording of such calls. In the SJC’s description of them:
The regulations provide that all inmate calls, except those made to attorneys, are subject to monitoring and recording by department officials. All inmates who use a telephone first must receive a personal identification number (PIN). The regulations provide that inmates who accept a PIN and use the telephone have consented to the monitoring and recording of telephone conversations with other than an attorney.
The regulations limit inmates to a total of fifteen telephone numbers to which they may place calls. Five of these numbers are reserved for attorneys. All fifteen numbers must be approved by the correctional institution and then programmed to the inmate’s PIN . . .
Inmates are limited to one-way collect calls. An automated operator system informs call recipients that the call is originating from an inmate at a Massachusetts correctional institution, that calls to persons other than attorneys are recorded, and that any attempt to access a three-party line or conference call will cause the system to disconnect the call immediately.
422 Mass. at 767 (footnotes omitted).
The SJC found that the DOC regulations served several legitimate penological purposes, including the detection and deterrence of such criminal activity as planning escapes, orchestrating drug trafficking, solicitations to murder, fraudulent use of third-party calls and telephone credit cards, as well as preventing harassment of victims, witnesses, public officials, and press. The court further held that they were reasonably related to these purposes and therefore valid, notwithstanding some incidental burdening of the inmates’ privacy interests, access to courts and counsel, and freedom of expression.[7] 422 Mass. at 770-75.
The DOC regulations considered in Cacicio closely resemble both the CCHOC’s practices and Middlesex Sheriffs Department policy; enough so, in fact, that one suspects that the regulations likely served as the model for the Middlesex Sheriffs policy. There is no reason to think that the concerns that led to the DOC regulations are any less pressing in a pretrial detention facility than in the state prison system. Under Cacicio, therefore, both the CCHOC’s and the Sheriffs policy of monitoring and recording calls from detainees, with notice to both parties to each call, are constitutional on their face.
3.Dissemination of Recordings and the Reasonable Expectation of Privacy
The court in Cacicio did not consider whether, or to what extent, recordings of calls may be shared with law enforcement, or used for purposes going beyond institutional security and detection of criminal activity in progress. It did, however, address the plaintiff inmates’ argument that the monitoring and recording of their telephone conversations violated the protections in Article 14 of the Declaration of Rights against unreasonable searched and seizures. The court noted that the federal courts have repeatedly rejected Fourth Amendment challenges to the practice, and that under established Massachusetts jurisprudence,
a protected privacy interest exists under art. 14 “when it is shown ‘that a person [has] exhibited an actual (subjective) expectation of privacy,’ and when that ‘expectation [is] one that society is prepared to recognize as ‘reasonable.’ ”
Although the plaintiffs have not consented to the monitoring and recording of their telephone calls, they have been made aware of the procedure and its requirements. The monitoring and recording is not *135 surreptitious in any sense. A place of incarceration is not accorded the protection given a private residence, and the record establishes that valid peno-logical interests justify the regulations. In these circumstances, art. 14 is not violated, and the regulations are valid against the facial challenge asserted.
422 Mass. at 772-73.
Fitzpatrick acknowledges the Cacicio holding, but points out that although he was required to compromise his privacy rights in service of legitimate penological interests, those interests relate primarily to the safety and security of the institution; they do not include investigation of the charge on which he is being held. See United States v. Cohen, 796 F.2d 20, 24 (2d Cir. 1986) (investigative search of detainee’s cell solely to obtain evidence in the pending case against him violated the Fourth Amendment because it did not serve a legitimate peno-logical interest). Fitzpatrick therefore argues that although he knew his conversations were being recorded and monitored for penological purposes, he did not expect, and should not reasonably have expected, that they would be shared with the district attorney for investigative purposes in connection with his pending case.
The first problem with Fitzpátiick’s position is that his assertion that he had a subjective expectation of privacy — specifically, that he believed the Sheriff and his staff would keep confidential any information related to his pending case — is belied by the evidence. Fitzpatrick mentioned to people he called that the phones were “bugged,” and “I need to be careful what I say on these phones.” There is even the suggestion that he may have attempted to use the recorded conversations to put out a sort of self-help alibi defense.[8]
The second problem with the argument is that it adopts an unrealistically formulaic concept of privacy. As the cases use the term, a “reasonable expectation of privacy” clearly refers to privacy as against the world in general. If the parties to a conversation should reasonably anticipate being overheard by anyone, the conversation is not private. Someone using a telephone, for example, runs the risk that a third party may be listening in on an extension on the other end, Commonwealth v. Eason, 427 Mass. 595, 600 (1998), or even that the person he called will turn out to be an informer. Hoffa v. United States, 385 U.S. 293, 302-03 (1966). Someone else, speaking loudly in an apartment, risks being overheard by someone in the publicly accessible hallway outside, Commonwealth v. Dinnall, 366 Mass. 165, 166-68 (1974), just as aguest in a hotel should expect that he might be overheard through a connecting door to the next room. Commonwealth v. Panetti, 406 Mass. 230, 232-33 (1989), and cases cited. Nor should a customer shouting at a convenience store clerk be surprised at being “overheard by a customer, a passerby, a store employee, or a surveillance camera recording his words.” Commonwealth v. Rivera, 445 Mass. 119, 127 (2005) (affirming denial of defendant’s motion to suppress audiovisual recording from surveillance camera).
In each of these cases the defendant, by speaking in a way that he could be overheard by someone nearby, took the chance that the listener might be a policeman or even — as in Rivera — a jury. The common thread is that “a person’s expectation that his spoken words will remain private should decline as his control of the listening environment diminishes.” Commonwealth v. Eason, 43 Mass.App.Ct. 114, 129 (1997) (Jacobs, J., dissenting), rev’d, 427 Mass. 595 (1998).
It is thus no answer for Fitzpatrick to say that while he knew the Sheriffs staff would be listening in on and recording his conversations, he reasonably expected the Sheriff would keep confidential anything he overheard concerning the pending case. No one made him any such promise. The Sheriff is a law enforcement officer. If he came across evidence of a crime, no reasonable person would expect him to keep it from the district attorney. As the SJC has said with respect to written communications, “[a] mere expectation that the person to whom an item is entrusted will use it for limited purposes and not reveal it to others does not give rise to a reasonable expectation of privacy recognized under the Fourth Amendment to the United States Constitution.” Commonwealth v. Buccella, 434 Mass. 473, 484 (2001).
It follows that Fitzpatrick has no cognizable liberty or privacy interest in the jail calls. The Sheriffs providing the recordings to the police for possible use as evidence against him did not deprive him of due process.
B. Wiretap Statute
G.L.c. 272, §99 governs the interception of wire and oral communications. It prescribes the procedure for obtaining a warrant to intercept such communications, and criminal penalties for unauthorized interceptions. A violation of the statute is ground for suppression of any evidence obtained through the unlawful interception, to whatever extent is necessaiy to further the deterrent function of the exclusionary rule. G.L.c. 272, §99(P); Commonwealth v. Barboza, 54 Mass.App.Ct. 99, 103-05 (2001).
The event which triggers application of the statute is an “interception,” which the statute defines as follows:
The term “interception” means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication,
with exceptions not here relevant. G.L.c. 272, §99(B)(4).
Fitzpatrick concedes that the taping of his calls was not “secret,” and therefore was not itself an “interception.” He contends, however, that there was an “interception” when the two sheriffs, without his knowledge, provided copies of the recordings to the State Police.
*136 “Interception,” in its plain-Englishusage, means “the act or instance of receiving electronic transmissions before they reach the intended recipient” Oxford American College Dictionary (2002) (emphasis supplied). The statute narrows this colloquial definition in one respect (the interception must be secret), and broadens it in another (purely oral as well as wire communications are covered). Nothing in the wording of the statute, however, suggests that the term “interception” extends to a later dissemination of a previously intercepted and recorded statement. Just as in football, an “interception” is a single, momentary act. A subsequent handoff is not a second interception.
Fitzpatrick’s argument on this point is further undercut by the fact that elsewhere, the statute expressly addresses disclosure of intercepted communications to third persons:
Except as otherwise specifically provided in this section any person who—
a. willfully discloses or attempts to disclose to any person the contents of any wire or oral communication, knowing that the information was obtained through interception; or
b. willfully uses or attempts to use the contents of any wire or oral communication, knowing that the information was obtained through interception, shall be guilty of a misdemeanor punishable by imprisonment in a jail or a house of correction for not more than two years or by a fine of not more than five thousand dollars or both.
c.272, §99(C)(3). “(O)btained through interception,” however, throughout this statute means obtained “secretly.” Section 99(C)(3) — which would have been wholly unnecessary if the defined term “interception” extended to a later disclosure or sharing of previously recorded conversations — therefore has no application to the dissemination of a recording made originally with the knowledge of both parties to the conversation.
Finally, violation of section 99 is a crime. Fitzpatrick’s expansive reading of the defined term “interception” ignores “the well-established proposition that criminal statutes are to be construed narrowly." Commonwealth v. Pagan, 445 Mass. 161, 167 (2005).
There was no “interception” in this case, and thus no violation of G.L.c. 272, §99.[9]
ORDER
For the foregoing reasons, Defendant’s Motion to Suppress Jail Calls is DENIED.

 Tpr. Baker, of course, does not know this directly, but it is a reasonable inference which, in the absence of any contrary evidence, I draw.

 Pursuant to the Sheriffs Telephone Access and Use policy, calis to numbers designated by the inmate as attorneys or clergy are not monitored or recorded. See ¶14, below.

 See footnote 1, supra, which pertains equally here as to the CCHOC calls.

 Deputy Finn testified that the recordings that he is able to retrieve do not include such calls.

 Deputy Finn testified that about two months ago, the Sheriffs Department changed the “prompt” — the recorded message at the beginning of each call — to include a Miranda-like warning, advising the parties that anything they say may be used in a court proceeding. There was no such warning during the period of the recordings to which this motion relates.

 The decisions of which I am been provided copies are, in reverse chronological order: Commonwealth v. Dubose, Suffolk Superior Court Criminal No. 07-10019, “Memorandum of Decision and Order on Defendant’s Motion to Suppress Jail Recordings,” dated 5/8/087 (Riley, J.; suppressing recordings obtained by grand jury subpoena); Commonwealth v. Martin, Suffolk Superior Court Criminal No. 07-10193, “Findings of Fact, Conclusions of Law, and Order on Defendant’s Motion to Suppress Jail Recordings,” docketed 12/5/07 (Gants, J.; declining to suppressing recordings obtained by grand jury subpoena); Commonwealth v. Lopes, Suffolk Superior Court Criminal No.03-10979, “Memorandum of Decision and Order on Defendant’s Motion to Preclude Hampden and Suffolk County Sheriffs from Disclosing Defendant’s Recorded Telephone Calls to Commonwealth,” docketed 8/2/04 (Muse, J.; permitting Hampden County to provide prosecution with recordings, but enjoining Suffolk sheriff from doing so in the absence of a written policy governing telephone usage); and Commonwealth v. Acevedo, et al., Hampden Superior Court Criminal Nos. 00-1279, 00-1283, 00-1285, 00-1294, 00-1302, “Memorandum and Order on Defendants’ Motion to Suppress,” docketed 5/15/01 (Ford, J.; declining to suppress recordings obtained by subpoena).

 The court looked to four considerations, borrowed from Tumer v. Safley, 482 U.S. 78, 89 (1987), to determine whether a regulation or practice bears a reasonable relationship to a legitimate penological purpose: “(1) Is there a valid, rational connection between the regulation and the governmental interest put forward to justify it, and is the governmental interest legitimate and neutral; (2) do alternative means of exercising the challenged right remain open to inmates; (3) will accommodating the challenged right have a significant "ripple effect" on guards, other inmates, and the allocation of prison resources in general; and (4) does an alternative to the regulation exist which would fully accommodate the inmates’ rights at de minimis cost to valid penological interests?" 422 Mass. at 770.

 This was Tpr. Baker’s interpretation of what he heard. I myself have not heard the recordings beyond the initial recorded notice quoted above.

 Cf. Commonwealth v. Ennis, 439 Mass. 64 (2003), in which the SJC affirmed the denial of a motion to suppress a recording of a prison call. There, the defendant Ennis was at liberty. An inmate at the Plymouth House or Correction called a friend, who — after the recorded advisory concerning monitoring and recording was over — conferenced in Ennis, who then made incriminating statements. While accepting the Commonwealth’s concession that the recording of the call was an “interception” — because it was done without Ennis’s knowledge or consent — the SJC held it was not willful, and therefore not unlawful. It does not seem to have occurred to anyone to consider the Sheriffs subsequent turnover of the recording to law enforcement as a second interception. See also Commonwealth v. Cooper, 71 Mass.App.Ct. 1102 (2007) (Rule 1:28 decision holding that counsel was not ineffective for failing to move to suppress jail calls; “Because . . . the recorded call . . . complies with Department of Correction’s regulations, filing such a motion would have been futile”).