Macdonald, D. Lloyd, J.
Before the Court is the plaintiffs certiorari appeal pursuant to G.L.c. 249, §4 of the West Roxbuiy District Court’s de novo review of the defendant’s determination that the plaintiffs Anatolian Shepherd dog be euthanized on account of its being a “nuisance by reason of vicious disposition or excessive barking or other disturbance.” G.L.c. 140, §157. The lower court concluded that the dog was a nuisance and ordered that it be humanely euthanized. The Court DENIES the plaintiffs further appeal and AFFIRMS the decision of the lower court.
Pertinent Facts
On November 30, 2007 Theodore Garguilo (“Gar-guilo”), a 59-year-old male from California, was visiting a friend in Hyde Park. The friend rented an apartment from the plaintiff in a three-family dwelling where the plaintiff also resided. At the time of the incident Garguilo and his friend were leaving to attend a wedding.
The plaintiff owned an Anatolian Shepherd dog named Rory. Roiy was similar in aspect to a Great Dane and weighed approximately 120 pounds. Roiy was routinely allowed by the plaintiff to roam free in a fenced yard on the premises.
According to Garguilo’s account as memorialized in the medical records[1] as he was walking behind his friend down the stairs of the residence into the yard, Roiy attacked him. Garguilo was knocked to the ground and mauled. He suffered three jagged lacerations to his left cheek, as well as lacerations to his groin, lower left leg, neck and hands. Photographs of his injuries were taken the next day and introduced as evidence.[2]
At the time of the attack, Garguilo’s friend was walking ahead of him. When his friend heard the commotion behind him, he turned around and immediately succeeded in calling Roiy off. Garguilo was taken by ambulance to Carney Hospital but was then transferred to the Massachusetts General Hospital, where he underwent four hours of reconstructive surgery. He was kept overnight and released the next day.
Procedural History
After having been informed of the incident, the City of Boston Animal Control office (“Animal Control”) attempted to take possession of the dog for quarantining pursuant to G.L.c. 129, §21. However, the plaintiff refused voluntarily to relinquish custody of Rory. Animal Control then secured an order from the District Court authorizing the dog’s removal, and the dog was removed.
On December 9th Garguilo, who is a resident of California and had returned there, requested a hearing pursuant to G.L.c. 140, § 157 that the dog be found a nuisance.
Thereafter, on December 11th, Animal Control conducted a hearing. Roiy was examined by a specialist in animal behavior associated with the Animal Rescue League of Boston, Dr. Amy Marder (“Dr. Marder”). Dr. Marder concluded that the dog was dangerous and advised that it be euthanized. Animal Control ordered that Rory be put down.
The plaintiff then filed an appeal of Animal Control’s decision, and the parties appeared before a clerk-magistrate in the West Roxbury District Court pursuant to G.L.c. 140, §157. The clerk-magistrate affirmed Animal Control’s decision.
The plaintiff then further appealed, also pursuant to the statute. Over a two-day period the matter was tried de novo before a District Court justice. At its conclusion, the judge determined that there was “substantial evidence that Rory is a vicious dog and, consequently, poses a serious danger to the public.” In her written decision, she found that “(t]he attack on Garguilo was not simply a dog bite. It was a full-scale mauling so serious that Garguilo was neither able to defend himself nor escape as Roiy had him pinned on the ground. Had [his friend] not been present to call Roiy off, Garguilo’s injuries would undoubtedly have been even more serious.”
The matter is now before this court on a writ of certiorari. G.L.c. 249, §4. Meanwhile, Roiy has been kept at the City of Boston Animal Shelter (the “City Shelter”).
Scope of Review
An action for certiorari is only available “to correct errors in proceedings which are not according to the course of the common law, which proceedings are not otherwise reviewable by motion or by appeal.” G.L.c. 249,§4.
*588 On certiorari review “[a] court will correct only a substantial error of law, evidenced by the record, which adversely affects a material right of the plaintiff ... In its review, the court may rectify only those errors of law which have resulted in manifest injustice to the plaintiff or which have adversely affected the real interests of the general public.” Massachusetts Bay Transp. Auth. v. Auditor of the Commonwealth, 430 Mass. 783, 790-91 (2000), quoting Carney v. Springfield, 403 Mass. 604, 605 (1988). “The court’s power on certiorari is not exercised to remedy mere technical errors that have not resulted in manifest injustice.” Mass. Prisoners Assn. Political Action Comm. v. Acting Governor, 435 Mass. 811, 824 (2002).
Therefore, the question before this Court is whether, on the basis of the record, the District Court substantially erred in a way that materially affected the rights of the Plaintiff or the public interest and whether the District Court’s decision was supported by substantial evidence. See Goldie’s Salvage, Inc. v. Selectmen of Walpole, 31 Mass.App.Ct. 726, 732, 583 N.E.2d 878 (1992). See generally Durbin v. Bd. of Selectmen of Kingston, 62 Mass.App.Ct. 1, 4-6 (2004).
Discussion
In the plaintiffs 55-page memorandum in support of her appeal[3] multiple alleged errors of law were identified, but the plaintiffs central argument is that there was no substantial evidence to support the statutory determination that Rory had a “vicious disposition” since only a single incident of harm was proved.
In pertinent part G.L.c. 40, §157 provides:
If any person shall make complaint in writing to the selectmen of a town, the officer in charge of the animal commission or person charged with the responsibility of handling dog complaints of a city, or the county commissioners, that any dog owned or harbored within his or their jurisdiction is a nuisance by reason of vicious disposition or excessive barking or other disturbance . . . [such] officer in charge of the animal commission ... shall investigate or cause to be investigated such complaint . . . and may make such order concerning the restraint or disposal of such dog as may be deemed necessaiy. [Emphasis added.)
The issue here is whether there was sufficient evidence of nuisance as so defined.
The first point to observe is that “nuisance” is statutorily defined in the disjunctive, i.e., it can be based on “disposition” or it can be based on an “other disturbance.” While “disposition” might normally connote more than a single incident of conduct, “other disturbance” is not so limited.
Furthermore, the common law of nuisance encompasses within its definition conduct that because of its singular seriousness comprises a threat to the public health. “[T]he nature of the defendant’s conduct and the character of the resulting wrong are factors in the determination of the existence of a nuisance.” United Elec. Light Co. v. Deliso Constr. Co., 315 Mass. 313 (1943). “Sometimes the nuisance takes the form of a series of acts, or a continuing trespass, but it may arise from a single act.” Id., citing Reppucci v. Poleari, 291 Mass. 424, 426-27 (1935). Moreover, “[t]hereis no hard and fast rule as to what does and what does not amount to a nuisance ... It is largely a matter of degree and of the relationship of various factors to each other.” Kasper v. H.P Hood & Sons, Inc., 294 Mass. 24, 27 (1935).
In Saldi v. Brighton Stock Yard Co., the SJC cited with approval a law review article which states that “[t]he primary function of nuisance as a separate topic ... is to mark out the area within which it is unreasonable for one to subject his neighbors or the public to noise, vibrations, fumes, immorality or the risk of physical harm. Where there is a nuisance because of risk of harm, nuisance overlaps negligence.” 344 Mass. 89, 98 n.5 (1962), citing Seavey, Nuisance: Contributory Negligence and other Mysteries, 65 Harv.L.Rev. 984, 985, n.4. Thus, the risk of physical harm itself — whether from a single or multiple incidents — may establish a nuisance.
In a 2004 case construing the elements of G.L.c. 40, §157 that is largely dispositive of the issues before the Court, the Appeals Court held that it was not error for the District Court judge to have refused a requested ruling of law to the effect that “in order for a dog to be deemed a nuisance by reason of vicious disposition, it must be proved that the dog was ‘accustomed to attack and injure mankind’ and that the dog possessed ‘a general propensity’ to be vicious to others.” Durbin v. Bd. of Selectmen of Kingston, supra, 62 Mass.App.Ct. at 12-13. Thus, it was not an error of law for the District Court to have found the single incident of attack by Roiy sufficient to support a finding of nuisance.
Furthermore, there was substantial evidence to support the District Court’s factual conclusion that Roiy posed a nuisance.
First, was the evidence as to the circumstances of the attack itself: Without warning, Garguilo was knocked to the ground by the 120-pound dog and badly mauled. This was the core finding of the court below upon which she based her determination. Standing alone, it is sufficient as a matter of law.
Second, the judge heard evidence from the City’s expert, Dr. Marder,[4] who concluded that the dog was dangerous and should be put down. She stated: “The extreme damage that Roiy caused to the victim with no other provocation than being on the dog’s territoiy makes Rory, in my opinion, a very dangerous dog.” 3/10/08 Tr. at 151.
Dr. Marder had substantial experience upon which to draw for her conclusion. She had been on the staff of and had done research for the Animal Rescue *589 League for many years, and she performed on average 300-400 evaluations of dogs a year. 95% of such dogs, she stated, had aggression issues. Of that number, Dr. Marder testified that on average she recommended euthanasia in less than one instance per year. As to Roiy, she “observed very aggressive cage behavior . . . I was afraid of him.” 3/10/08 Tr. at 149.[5]
The senior attendant at the City Shelter testified before the District Court that he was the only person at the Shelter who felt comfortable in walking Roiy. The others were “afraid” of him, notwithstanding that 75% of the dogs that are kept at the Ciiy Shelter are “aggressive.” He testified that Roiy was “unpredictable” and that he did “not trust him.” 3/10/08 Tr. At 137-38.
The plaintiff also called an expert, Raymond McS-oley (“McSoley”). If there was any doubt about the reasoned basis of the District Court’s conclusion, it was answered by McSoley’s testimony.[6] McSoley is an animal behavior specialist, and he testified to the distinguishing features of the Anatolian Shepherd breed. He described it as an “ancient breed” (March 25, 2008 Transcript at 15, appearing as Exhibit 16 to the Affidavit of Anouk Danan), with its origins in Mesopotamia. The breed was raised, trained and culled to protect shepherds’ flocks, the dogs’ owners and their property. The dogs became “extremely important for the shepherd. Without them, he’d lose a large percentage of his flock to either bears, or up in the mountains, to wolves.” Id.
McSoley described a traditional custom whereby if an Anatolian Shepherd killed a wolf, the dog was deemed “worthy” and the dog would be “awarded” a collar comprised of “spikes that are maybe six-seven inches long.” The spiked collar was then worn by the dog for life. Id. He noted that the breed is “veiy territorial. They are fierce protectors of the flock.” Id.at 16.
According to McSoley, Anatolian Shepherds were first brought to the United States in the 1970s. He considers them “probably the most primitive breed in the country” but “not in a negative sense,” rather in the sense that the purity of their histoiy and function as “working” dogs had not changed over the centuries. Id. “They’re flock-guarders. And they’ll protect the villages over there in Turkey from intruders. And that’s what they do. But their loyalty to their owners is incredible.” Id. at 17.
Asked to explain the attack on Garguilo, McSoley testified that he understood that Roiy had not simply lunged at Garguilo but rather had attacked only after Garguilo had made some casual comment to him and then “stared” at the dog. The latter may have been interpreted, McSoley said, at once, as fear and a “challenge.” Id. at 28-29. According to McSoley, Gar-guilo to Roiy was “an intruder. He’s not — he hasn’t been accepted by the leader [the dog’s owner). So, [Garguilo] is an aggressor coming onto the property. In this case, he wasn’t even in the process of coming onto the property; he was already on the property. So the dog, being an Anatolian Shepherd, with thousands of years of breeding for this particular job, that’s what he did. That’s why he reacted.” Id. at 30-31.[7]
McSoley described the photographs of Garguilo’s injuries as “disturbing” and “unsettling.” “But this is, you know, not a Brittany Spaniel. I mean this is a dog who understands what his job is if no one’s there to tell him, ‘I’ll take responsibility.’ ” Id. at 33. Later in his testimony, McSoley returned to this insight: “If there’s no one to give — to tell him how to behave, then [Roiy’s] answerable only to himself.” Id. at 43. On cross-examination, McSoley was asked how he would expect Roiy to react if an intruder were in fact in the plaintiffs house. McSoley responded, “I would expect the dog is probably going to chew the hell out of them.” Id. at 46.
With the above evidence before her, the District Court Judge had “substantial evidence” to conclude that Rory was “a nuisance by reason of vicious disposition or . . . other disturbance.”[8]
The remaining errors of law cited by the plaintiff are without substance. See Durbin v. Bd. of Selectmen of Kingston, supra, 62 Mass.App.Ct. at 11-14.
ORDER
The Plaintiffs appeal is DENIED. The decision and order of the West Roxbuiy District Court to euthanize humanely the dog, Roiy, is AFFIRMED.

 Exhibit B to the Affidavit of Anouk Danan.

Exhibit C to the Affidavit of Anouk Danan.

Leave of court was obtained to exceed the Superior Court Rule 9A(a)(5)'20-page limit. In retrospect, such leave appears to have been improvidently granted.

Plaintiffs counsel stipulated to Dr. Marder’s expertise, stating on the record that he had known her for 25 years and accepted that she was a “qualified expert.” March 10, 2008 Transcript (“3/10/08 Tr.”) at 140.

Notwithstanding Dr. Marder’s credentials and experience, the District Court judge in her opinion stated, “I place little reliance on Marder’s report since it is difficult to determine whether Roiy’s behavior in her presence is attributable to an aggressive nature or the fact that he had recently been removed from his home.” Without exceeding the scope of review of the lower court’s determinations of fact according to the principles earlier discussed, “[i]t is well established that, on appeal, [the court] may consider any ground apparent on the record that supports the result reached in the lower court.” Gabbidon v. King, 414 Mass. 685, 686 (1993).

Just as the District Court justice noted that she placed “little reliance” on Dr. Marder’s “report,” the justice stated, “Neither do I rely on McSoley’s more benign characterization of Roiy ...” Exhibit A to the Affidavit of Anouk Danan at 8, n.5. This Court on certiorari can evaluate the evidentiaiy record as a whole to determine whether substantial evidence exists to support the lower court’s determination. Here, what is significant is not McSoley’s conclusion but rather the origin and behavioral attributes of the breed that McSoley credibly described on the basis of his expertise as a dog behaviorist.

McSoley also hypothesized that Roiy may have reacted the way he did because of his acting out what McSoley described as the “odd-person syndrome.” He noted that Gar- *590 güilo had a substantial growth of beard and that Rory could have found that to be out of place. ‘These are dogs that will pick up an odd behavior in a person and react to it. For example, it may be a person limping. There are dogs, for example, that react strongly towards homeless people. Anything that, with some dogs, can appear out of the ordinaiy can upset a dog.” Id. at 29.

The facts of this case present a cautionary tale for those who choose an exotic breed like an Anatolian Shepherd as their pet, especially in an urban environment. As McSoley testified, “[Rory] is a serious dog, I mean, he’s not a — these are not primarily pets. These are working dogs.” Id. at 33. In the Court’s view, working dogs bred over centuries to kill wolves and bears and to protect their owners’ territory without restraint cannot reasonably be expected to be immune from the influence of their DNA after little more than a generation separated from the harsh territory from which they developed as a breed.