MASSACHUSETTS PRISONERS ASSOCIATION POLITICAL ACTION COMMITTEE & others[1] *vs.* THE ACTING GOVERNOR & others.[2]

Suffolk. October 2, 2001. - February 6, 2002.

Present (Sitting at Salem): MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Political Committee. Constitutional Law,* Political contributions, Freedom of speech and press, Freedom of association, Equal protection of laws, Use of public money or property. *Due Process of Law,* Prison regulation, Prison disciplinary proceedings.

Correctional facilities are buildings "occupied for state, county or municipal purposes" within the meaning of G. L. c. 55, § 14, and therefore, an executive order prohibiting the solicitation of money in a State prison for political purposes correctly applied the statute to inmates in State prisons. [816-819]

As applied to inmates, G. L. c. 55, § 14, which prohibits solicitation of money for political purposes in buildings occupied for State purposes, and the policy of the Department of Corrections forbidding inmate political organizations, were reasonably related to penological interests and therefore did not violate prisoners' free speech, association, and equal protection guarantees under the First and Fourteenth Amendments to the United States Constitution and arts. 1, 16, and 19 of the Declaration of Rights of the Massachusetts Constitution. [819-823]

There was sufficient evidence to support disciplinary sanctions imposed on a prisoner who solicited funds for political purposes in a State correctional facility in violation of G. L. c. 55, § 14; this court declined to exercise its power on certiorari to remedy a technical error that resulted from the inclusion of a duplicative disciplinary charge in the sanctions, where no manifest injustice resulted. [823-824]

CIVIL ACTION commenced in the Superior Court Department on November 13, 1997.

The case was heard by *John C. Cratsley,* J., on motions for summary judgment and judgment on the pleadings.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

---

[1] Michael Shea, Joseph Labriola, John Currie, Michael Fountain, Sandra Currie, and William Smallwood.

[2] Commissioner of Correction and the Department of Correction.

*Anthony M. Doniger* (*William L. Boesch & John Reinstein* with him) for the plaintiffs.

*Adam Simms*, Assistant Attorney General, for the defendants.

SOSMAN, J. The plaintiffs, organizers of the Massachusetts Prisoners Association Political Action Committee (MPAPAC), filed the present action challenging Executive Order No. 399, which directed the Department of Correction (department) to prohibit political fundraising in prisons, as required by G. L. c. 55, § 14. The plaintiff Michael Shea also sought to overturn disciplinary sanctions imposed on him for violation of that statute. A Superior Court judge entered summary judgment for the defendants, holding that the department properly enforced G. L. c. 55, § 14, in State correctional facilities. The judge also affirmed the challenged disciplinary sanctions. The plaintiffs appealed, and we transferred the case to this court on our own motion. For the following reasons, we affirm the judgment.

1. *Facts.* The undisputed facts are as follows. The plaintiffs Shea, Joseph Labriola, John Currie, Michael Fountain, and William Smallwood are presently inmates at various Massachusetts correctional facilities. They are all registered to vote in Massachusetts. The plaintiff Sandra Currie is also a registered Massachusetts voter; she is not an inmate. Together, the plaintiffs are organizers and members of MPAPAC, a "political committee" as defined by G. L. c. 55, § 1.

On August 11, 1997, MPAPAC filed its statement of organization with the office of campaign and political finance (OCPF), as required for any political committee. G. L. c. 55, § 5. The statement named Shea as chairman and Sandra Currie as treasurer. According to the statement, MPAPAC was formed "for the purpose of providing educational material to prisoners of the Commonwealth and their family members dealing with the voting records of elected officials as it pertains to prisons." The statement announced that MPAPAC would "encourage all prisoners and family members to register to vote, as well as to participate in the electoral process," and would contribute money to political candidates who had "a track record of being fair and open minded on prisoner issues." The statement further announced that "[f]inancial donations to [MPAPAC] are

435 Mass. 811 (2002)                     813

Massachusetts Prisoners Association Political Action Committee v. The Acting Governor.

expected to come mainly from prisoners in amounts under ten dollars."[3]

The next day, the Acting Governor issued Executive Order No. 399. The order identified State prisons as "public buildings," concluded that the solicitation of money in a State prison for political purposes would violate G. L. c. 55, § 14, and directed the department "to enforce an absolute prohibition on prisoners engaging in any form of solicitation of money or other things of value for political purposes." The Acting Governor prescribed that enforcement measures were to include the "immediate confiscation of any materials related to solicitation of money or other things of value for political purposes," the imposition of disciplinary sanctions, and referral to law enforcement for criminal prosecution.

On August 13, 1997, the day after the issuance of Executive Order No. 399, department officials searched the cells of several of the inmate plaintiffs and confiscated papers related to MPAPAC. Among the documents seized from Shea's cell, department officials discovered notes related to the MPAPAC statement of organization and a newsletter with the heading "Massachusetts Prisoners Association." The newsletter described MPAPAC and its intent to "financially assist candidates for political office," and closed with the following: "We would greatly appreciate any financial donation you may be able to afford to assist us in our attempts to significantly alter the current trends and direction. Donations may be made by making a check payable to: MASSACHUSETTS PRISONERS ASSOCIATION." The newsletter then listed a post office box in Fitchburg as the address to which donations could be

---

[3]After the judge's allowance of the defendants' motion for summary judgment, MPAPAC filed an amended statement with OCPF and then sought reconsideration based on the contents of the amended statement. The amended statement announced that "it is not the intent of [MPAPAC] or any of its Prisoner Board Members . . . to create any security issue or concern, or to violate any Department of Correction Rule or Regulation," and promised that MPAPAC would have no more than ten inmate members. The amended statement further claimed that the prisoner members did not intend to "solicit any financial support from other prisoners from within the Prison," but simultaneously announced the expectation that contributions would come "from prisoners currently incarcerated." The motion for reconsideration was denied.

sent. During the search of Fountain's cell, department officials found a letter from Shea to Fountain, which made reference to "enclosing a copy of our newsletter for the pac, as well as a copy of our letterhead." In the letter, Shea told Fountain, "If anyone wants to donate a few bucks, they can send it to the [F]itchburg address as we have a separate bank account for the pac."[4]

Based on the materials uncovered during the searches, disciplinary proceedings were commenced against Shea. At an administrative hearing, the hearing officer determined that Shea had solicited funds for political purposes in violation of G. L. c. 55, § 14. As a result, the hearing officer found Shea guilty of the charges of violation of departmental rules and violation of a law of the Commonwealth. 103 Code Mass. Regs. § 430.24(2), (32) (1993). In addition, the hearing officer ruled that Shea's violation of G. L. c. 55, § 14, forced the department to conduct an investigation, thereby disrupting the orderly running of a correctional facility. 103 Code Mass. Regs. § 430.24(8) (1993). The hearing officer proceeded to impose disciplinary sanctions.

Various department regulations and policies address inmate finances and inmate organizations. The department's regulations prohibit inmate possession of cash. See 103 Code Mass. Regs. § 430.24(24) (1993). Inmates are not permitted to give money to or receive money from another inmate, family member, or friend without authorization. See *id.* at § 430.24(25). Instead, each correctional facility maintains personal and savings accounts for inmate funds, and inmates may initiate withdrawals by submitting a request to the facility accounting clerk or cashier, subject to approval by a department official. See 103 Code Mass. Regs. § 405.13(1), (2) (1994). When an inmate requests a transfer of funds from a personal account, a

---

[4]With certain exceptions, inmate-to-inmate correspondence is generally forbidden without special leave from the prison superintendent. Correspondence between prisoners who are parties to litigation is one category that is customarily approved. See 103 Code Mass. Regs. § 481.21 (2000). Shea's letter enclosed some pleadings in another case, and discussed the status of pending suits, and referred to Shea's having received authorization to write to Fountain. That authorization was presumably based on Shea's assertion that he wanted to transmit legal materials to another inmate party in litigation. Having obtained approval on that basis, he then enclosed the MPAPAC newsletter in the package of legal materials.

designated department official must consider the identity of the inmate requesting the transfer, the identity of the proposed recipient of the transfer, whether the transfer relates to any illicit activity, and whether the transfer implicates institutional security concerns. After Executive Order No. 399 was issued, the department's regulations were amended to forbid inmates from using political action committees to raise money for political purposes. See 103 Code Mass. Regs. § 405.16 (1999).

With some exceptions, inmates may not send written correspondence to other inmates without permission from the superintendent. See 103 Code Mass. Regs. § 481.21 (2000). Inmates must also seek approval from the department prior to forming any inmate organization.[5] Several approved inmate support groups and volunteer organizations exist within correctional facilities, and some of those organizations are permitted to collect dues from their members, all under the supervision of department officials. On occasion, inmate organizations have been permitted to solicit donations from fellow inmates for charities, again under the supervision of department officials.

The inmate members of MPAPAC never sought approval from department officials before filing their statement of organization with the OCPF. In his affidavit, the Commissioner of Correction stated that, because of serious security concerns about a political action committee within the prison, formed to raise money from inmates and challenge department policies, he would have banned MPAPAC, even if the Acting Governor had not issued Executive Order No. 399. Specifically, he is of the opinion that prisoner political organizations would undermine the general prohibition on inmate-to-inmate correspondence; create friction between inmates and staff, as well as between inmates who are active in MPAPAC and those who are not; and undermine the authority of department officials by creating inmate leaders who would hold themselves out as authority figures within the prison population.

---

[5] The plaintiffs characterize the department's policy forbidding prisoner organizations as an "unwritten" rule. That policy, however, merely gives substance to 103 Code Mass. Regs. § 430.24(8), which generally forbids inmate conduct that disrupts or interferes with the security or running of a correctional facility.

Inmates are allowed to participate in the political process in various ways. Inmates are permitted to vote, and to seek office, in certain local, State, and national elections.[6] They may contribute to political candidates, parties, or organizations. They are permitted to discuss their political views with other inmates. Inmates may write to individuals and organizations outside of correctional facilities, as well as to their elected representatives. Inmates are also permitted to file institutional grievances. See G. L. c. 124, § 1 (i); 103 Code Mass. Regs. § 491.00 (2001).

On appeal, the plaintiffs argue that Executive Order No. 399 misinterprets G. L. c. 55, § 14, or, in the alternative, that the statute as applied to prison inmates is unconstitutional. They also contend that the department's policy forbidding inmate political organizations violates the free speech, association, and equal protection guarantees of the United States Constitution and the Massachusetts Declaration of Rights. Finally, the plaintiffs contend that the disciplinary sanctions imposed on Shea were based on insufficient evidence, and must be reversed.

2. *General Laws c. 55, § 14.* "[I]ssues of statutory interpretation should be resolved prior to reaching any constitutional issue." *1010 Memorial Drive Tenants Corp.* v. *Fire Chief of Cambridge*, 424 Mass. 661, 663 (1997). We begin, therefore, by considering whether Executive Order No. 399 correctly applied G. L. c. 55, § 14, to inmates in State prisons.

By its terms, G. L. c. 55, § 14, prohibits solicitation of money for political purposes in buildings "occupied for state, county or municipal purposes." The terms "correctional facility" and "prison" are statutorily defined as "any building, enclosure, space or structure used for the custody, control and rehabilitation of committed offenders and of such other persons as may be placed in custody therein in accordance with law." G. L. c. 125, § 1 (d), (l). "Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for anti-social criminal, and often violent, conduct." *Hudson* v. *Palmer*, 468 U.S. 517, 526 (1984). The State purpose.

[6]In November, 2000, the voters of the Commonwealth approved an amendment to art. 3 of the Amendments to the Massachusetts Constitution, which now prohibits incarcerated felons from voting in elections for certain offices. See art. 120 of the Amendments to the Massachusetts Constitution.

in maintaining these facilities is manifest, as is the State purpose in having the facilities "occupied" by the inmates. G. L. c. 55, § 14. A straightforward reading of § 14 makes it applicable to correctional facilities.

The plaintiffs argue that the Legislature did not intend § 14 to reach conduct on government-owned premises that are used primarily to accommodate private parties, as opposed to government offices or agencies, and suggest that their occupancy of correctional facilities is the equivalent of occupancy by "private" parties. They point to several advisory opinions issued by OCPF, in which OCPF has advised that publicly owned buildings rented out for private functions are not subject to § 14. The premises at issue in those opinions housed no government offices, agencies, or functions, but were instead rented out for a variety of private nongovernmental uses.[7] The import of these advisory opinions is that § 14 is not implicated by mere government ownership of the building, but instead depends on the purpose for which the building is occupied. When a publicly owned building is being used for some nongovernmental purpose — a private sporting event, a performing arts organization rehearsal, a trade show, or convention — the mere fact of government ownership (and government receipt of rental income) does not equate with the building's being "occupied for state, county or municipal purposes."

Here, a large number of public employees and agents, and the inmates over whom the State has custody for a public purpose, are the sole occupants of correctional facilities. Inmates have not gone to prison and do not remain in prison for some "private" purpose. Rather, the occupancy by the inmates and staff is in furtherance of and exclusively for an entirely "public" purpose.

The plaintiffs also point to *Anderson* v. *Boston*, 376 Mass.

---

[7]Specifically, OCPF advised that political fundraising could occur (1) at Lelacheur Park in Lowell, which was owned by the city but leased to a privately owned baseball team; (2) at Melrose Memorial Hall, a vacant building that contained no municipal offices but had an auditorium and meeting space rented out to a variety of users for various functions; and (3) in the convention space at the John B. Hynes Veterans Memorial Convention Center, which was developed, promoted, and rented out as a convention facility "to accommodate gatherings of private parties."

178, 186-187 (1978), in which we ruled that a municipality could not appropriate funds to influence the outcome of a pending referendum question. Explaining our reasons why municipalities could not spend funds for such a purpose, we stated that various provisions in G. L. c. 55 evince "a general legislative intent to keep political fund raising and disbursing out of the hands of nonelective public employees and out of city and town halls." *Id.* Substituting that "general legislative intent" for the actual wording of § 14, the plaintiffs argue that only the public employees who work at correctional facilities would be subject to the prohibition of § 14 in their workplace areas, while inmates engaged in "private political activity" in their cells would not because those inmates do not occupy their cells for "state purposes." In our view, inmates are confined to correctional facilities, and to their cells in those facilities, for a State purpose. Moreover, we consider the actual language of the section at issue, not a summary characterization of the over-all purpose of many different sections of G. L. c. 55. Nothing in § 14 suggests that only the involvement of public employees (as either the person making or receiving the solicitation) would violate its provisions. Specific prohibitions against public employee solicitations and contributions, without regard to the location of the activity, are covered by other sections. See G. L. c. 55, §§ 13, 15, 16. What is prohibited in § 14 is political fund raising by anyone in specific locations, i.e., "in any building or part thereof occupied for state, county or municipal purposes." If the conduct occurs in such a building, the statute has been violated, without regard to the identity or status of the persons involved in making or receiving the solicitation.[8]

We are therefore satisfied that correctional facilities are buildings "occupied for state, county or municipal purposes" within

---

[8]The plaintiffs suggest that that interpretation would necessarily extend the reach of G. L. c. 55, § 14, to all State-owned buildings, and thereby raise grave constitutional concerns. Without reaching the more difficult hypothetical situations posited by the plaintiffs, which are not presently before the court, we think it sufficient to state that we do not strain the outer reaches of the underlying statutory language or legislative intent by concluding that a prison lies within the ambit of the statute. Whatever other public buildings may come within G. L. c. 55, § 14, a prison is certainly a building "occupied for state, county or municipal purposes."

435 Mass. 811 (2002)                                819

Massachusetts Prisoners Association Political Action Committee *v*. The Acting Governor.

the meaning of G. L. c. 55, § 14, and that the solicitation of funds for political purposes is therefore prohibited within those facilities.

3. *Constitutional claims*. We turn, then, to the plaintiffs' constitutional challenges. The plaintiffs claim that G. L. c. 55, § 14, as applied to inmates, and the department's policy forbidding inmate political organizations, violate the free speech, association, and equal protection guarantees of the First and Fourteenth Amendments to the United States Constitution and arts. 1, 16, and 19 of the Massachusetts Declaration of Rights. At the outset, we recognize that "[s]olicitation is a recognized form of speech protected by the First Amendment." *United States* v. *Kokinda*, 497 U.S. 720, 725 (1990). In addition, content-based distinctions may violate the equal protection guarantees of both the United States Constitution and the Massachusetts Declaration of Rights. See *Boston* v. *Back Bay Cultural Ass'n*, 418 Mass. 175, 182 n.8 (1994). As such, constitutional rights are plainly implicated by the statute and by the department's policy on prisoner organizations.

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner* v. *Safley*, 482 U.S. 78, 89 (1987) (*Turner*). "Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Id.* "[E]ven when an institutional restriction infringes a specific constitutional guarantee . . . the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Bell* v. *Wolfish*, 441 U.S. 520, 547 (1979). "We are aware . . . that '[t]he operation of a correctional institution is at best an extraordinarily difficult undertaking' and, therefore, we have recognized that prison administrators must have broad discretion in the administration of prison affairs." *Kenney* v. *Commissioner of Correction*, 393 Mass. 28, 35 (1984), quoting *Real* v. *Superintendent, Mass. Correctional Inst., Walpole*, 390 Mass. 399, 406 (1983).

Acknowledging the difficulty that prison officials face in the

operation of prisons, we have expressly adopted *Turner*'s deferential standard of review for constitutional challenges to prison regulations and policies. See *Cacicio* v. *Secretary of Pub. Safety*, 422 Mass. 764, 769-770 (1996). We also adopted *Turner's* four-factor inquiry to determine whether a prison regulation is reasonably related to a legitimate penological interest: "(1) Is there a valid, rational connection between the regulation and the governmental interest put forward to justify it, and is the governmental interest legitimate and neutral; (2) do alternative means of exercising the challenged right remain open to inmates; (3) will accommodating the challenged right have a significant 'ripple effect' on guards, other inmates, and the allocation of prison resources in general; and (4) does an alternative to the regulation exist which would fully accommodate the inmates' rights at de minimis cost to valid penological interests?" *Cacicio* v. *Secretary of Pub. Safety*, *supra* at 770, citing *Turner, supra* at 89-91.[9]

Applying these factors to the plaintiffs' claims, we conclude

[9]The plaintiffs argue that prison officials must first show that a regulation is addressed to activities likely to pose a serious threat to prison order or security before a court should apply the deferential standard outlined in *Turner* v. *Safley*, 482 U.S. 78 (1987) (*Turner*). Absent such a showing, they contend that *Procunier* v. *Martinez*, 416 U.S. 396, 413 (1974), requires that prison regulations be narrowly tailored to further the substantial government interests in the security and order of the facility or the rehabilitation of the inmate. The plaintiffs' argument misreads *Procunier* v. *Martinez, supra*, and ignores the Supreme Court's later explications of that decision. *Turner, supra* at 84-87. *Thornburgh* v. *Abbott*, 490 U.S. 401, 413-414 (1989). *Procunier* v. *Martinez, supra* at 408, addressed the issue of censorship of inmate correspondence with persons outside the prison, a practice which "implicates more than the right of prisoners." It was in express recognition of the fact that "the First Amendment liberties of free citizens are implicated" that the Supreme Court applied a more stringent test. *Id.* at 409. *Turner* reiterated that the heightened scrutiny applied in *Procunier* v. *Martinez, supra*, was necessary to protect the rights of persons who were not prisoners, and explained the evolution of a less stringent standard in cases involving only the rights of prisoners themselves. *Turner, supra* at 85-89. Then, in *Thornburgh* v. *Abbott, supra*, the Supreme Court expressly limited the standard of *Procunier* v. *Martinez, supra*, to its precise facts, and rejected the suggestion that it "should, or need, be read as subjecting the decisions of prison officials to a strict 'least restrictive means' test." *Thornburgh* v. *Abbott, supra* at 411, 413-414. Today, consistent with the United States Supreme Court, we apply the reasonableness standard outlined in *Turner*, not the heightened scrutiny described in *Procunier* v. *Martinez, supra*.

that the statutory and regulatory prohibition against political fundraising in prisons and the department policy restricting organizations are reasonably related to legitimate penological interests. The commissioner has legitimate, neutral concerns about the security of correctional facilities, the potential use of inmate organizations to promote illegal activities, and the potential for coercion of inmates to make financial contributions to such organizations. Those concerns justify the challenged regulations and policy, and the challenged regulations and policy are rationally related to the goal of maintaining security. Any inmate organization poses some risk, without regard to its size, as it may easily be subverted to or used as a cover for unlawful activity within the prison.[10] The organization at issue here has, as its premise, an adversary and divisive posture that would only serve to exacerbate the "us against them" attitude that is already all too common within the prison system.[11] With an avowed intent to challenge a variety of department policies, MPAPAC would readily operate to foment further discontent and divisiveness. An inmate organization "where the focus is

---

[10]That the department has approved a limited number of inmate organizations does not diminish the security concerns at stake. The department has determined that there is a potential rehabilitative benefit to certain types of organizations, such as support groups for inmates who share specific problems (e.g., alcohol or drug addiction) or share a specific background (e.g., veterans of the war in Vietnam). The efforts involved in supervising such inmate groups, and the risks they can still pose despite such supervision, are worth undertaking because of the corresponding benefit to inmate rehabilitation. Where an organization does not offer such benefits, and indeed may be counterproductive to rehabilitation, we will not require the department to run additional security risks and expend additional efforts attempting to supervise such an organization. See *Jones* v. *North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 133-136 (1977) (distinguishing between potentially adversary and divisive inmate labor organization and therapeutic or charitable inmate organizations "serving a rehabilitative purpose [and] working in harmony with the goals and desires of the prison administrators").

[11]Notwithstanding the seemingly neutral and lofty goals announced in MPAPAC's statement of organization, Shea's letter to a fellow inmate proudly observed that the formation of MPAPAC had "opened up a hornets nest" and "rightly so," signing the letter below the phrase, "In the struggle." The department is not bound to accept prisoners' benign characterizations of MPAPAC's purpose or methods, nor is it required to trust MPAPAC's subsequent promise — made only after the defendants had prevailed on their summary judgment motion — that it would limit its actual membership to only ten prisoners.

822                                    435 Mass. 811 (2002)

Massachusetts Prisoners Association Political Action Committee *v.* The Acting Governor.

on the presentation of grievances to, and encouragement of adversary relations with, institution officials surely would rank high on anyone's list of potential trouble spots" within a prison. *Jones* v. *North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 133 (1977). When that same organization intends to raise funds from prisoners, the concerns only escalate.

As to the remaining factors under *Turner*, inmates continue to enjoy substantial alternative means of exercising the rights impinged on, including the ability to vote, discuss their political views with other inmates individually, and contribute their personal funds to candidates and outside organizations — including political action committees — subject to the neutral limitations on inmate accounts imposed by 103 Code Mass. Regs. § 405.00 (1999). In addition, inmates may receive correspondence from individuals outside prison, they may write to political leaders, and they may file institutional grievances. A significant "ripple effect" could result from compelling the department to accommodate a prisoner political action committee, including heightened security demands to prevent the coercion of inmates and to quell possible friction. Finally, the plaintiffs offered no alternative solution that could accommodate the inmates' rights "at de minimis cost to valid penological interests." *Cacicio* v. *Department of Pub. Safety*, *supra* at 770.

With specific reference to the plaintiffs' equal protection claim, we view *Jones* v. *North Carolina Prisoners' Labor Union, Inc.*, *supra* at 133-136, as dispositive. Prison officials need only demonstrate a rational basis for their differential treatment of prisoner organizations. *Id.* at 134. "It is precisely in matters such as this, the decision as to which of many groups should be allowed to operate within the prison walls, where, confronted with claims based on the Equal Protection Clause, the courts should allow the prison administrators the full latitude of discretion, unless it can be firmly stated that the two groups are so similar that discretion has been abused." *Id.* at 136. We believe that the department has demonstrated a rational basis for barring MPAPAC while allowing other organizations to exist within prisons. Here, as in *Jones* v. *North Carolina Prisoners' Labor Union, Inc.*, *supra*, prison officials have rationally distinguished between an inmate organization with an avowed adversary

purpose and inmate organizations that serve valid rehabilitative goals. See note 10, *supra*.

4. *Disciplinary sanctions*. Shea also challenges the disciplinary sanctions imposed on him arising out of his involvement with MPAPAC. To the extent those challenges mirror the constitutional claims discussed above, they fail for the reasons indicated.

Shea also contends that there was insufficient evidence that he had "solicited" anyone, arguing that the mere filing of the required statement of organization with OCPF did not constitute "solicitation." The hearing officer's determination that Shea had solicited funds for political purposes in a State correctional facility in violation of G. L. c. 55, § 14, was not based solely on the filing of the MPAPAC statement of organization; rather, the hearing officer also had before him the letter Shea sent to Fountain with its enclosed MPAPAC newsletter. Shea's letter suggested that "[i]f anyone wants to donate a few bucks, they can send it to the [F]itchburg address," and the enclosed MPAPAC newsletter provided the Fitchburg address and encouraged donations with an express invitation ("We would greatly appreciate any financial donation you may be able to afford to assist us in our attempts to significantly alter the current trends and direction"). In combination, these materials solicited Fountain to make a contribution, and implicitly encouraged Fountain to solicit others. There was thus substantial evidence before the hearing officer that Shea had solicited funds for political purposes in a State correctional facility, and that he had thereby violated both a departmental regulation and a law of the Commonwealth. 103 Code Mass. Regs. § 430.24(2), (32).

We recognize that there is duplication and a degree of "overkill" in charging Shea with having disrupted the orderly running of a correctional facility (103 Code Mass. Regs. § 430.24[8]) merely because his violation of another regulation caused the department to expend effort investigating that violation. On that theory, any infraction of any nature would automatically implicate § 430.24(8) as well, as any charged violation entails some effort in pursuing the investigation and disciplinary proceedings. There is no suggestion, however, that the adverse finding on that duplicative charge had any impact

on the sanction imposed. The court's power on certiorari is not exercised to remedy mere technical errors that have not resulted in manifest injustice, see *Chick's Constr. Co.* v. *Wachusett Regional High Sch. Dist. Sch. Comm.*, 343 Mass. 38, 41 (1961), and cases cited, and we do not see that any manifest injustice has resulted from the inclusion of that duplicative disciplinary charge.

*Judgment affirmed.*