NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-435                                        Appeals Court


GORDON HAAS & others[1] vs. COMMISSIONER OF CORRECTION & others.[2]


No. 22-P-435.

Worcester.     March 7, 2023. – July 17, 2023.

Present:  Sullivan, Sacks, & Ditkoff, JJ.


Imprisonment, Earnings of prisoner.  Commissioner of Correction.
     Administrative Law, Regulations.  Due Process of Law,
     Prison regulation.  Regulation.  Practice, Civil,
     Dismissal.


     Civil action commenced in the Superior Court Department on
July 24, 2019.

     A motion to dismiss was heard by David M. Hodge, J., and a
motion for reconsideration was considered by him.


     Gordon Haas, pro se.
     Heidi D. Handler for the defendants.


_____

     [1] Daniel Holland, Ricky Alford, James Keown, and Martin
Lovato.

     [2] Director of Classification for the Department of
Correction, Superintendent of the Massachusetts Correctional
Institution, Norfolk (MCI-Norfolk), and Deputy Superintendent of
Reentry at MCI-Norfolk.

SACKS, J.  The plaintiffs, all of whom are serving life sentences in the custody of the Department of Correction (DOC), brought this action for declaratory and injunctive relief against DOC officials to challenge the validity of a newly issued DOC "standard operating procedure" (SOP) that restricts the disbursement of funds from inmates' institutional accounts. The SOP's stated purpose is to prevent disbursements "related to any illicit or improper activity."  SOP § I.[3]  Its core provisions essentially prohibit inmates (1) from sending funds directly to private individuals outside prison walls; and (2) from sending funds to businesses or organizations unless the inmate's disbursement request is accompanied by an invoice from, or an order form issued by, the business or organization.  On the defendants' motion, a Superior Court judge dismissed the verified complaint for failure to state a claim on which relief could be granted.  We conclude that the verified complaint states claims, sufficient to withstand a motion to dismiss, that the SOP (a) conflicts with a preexisting DOC regulation governing disbursements of inmate funds; and (b) was itself required to be promulgated as a regulation pursuant to G. L. c. 30A procedures.  We also conclude that it was premature to dismiss the plaintiffs' due process claim.  We therefore reverse

---

[3] The same SOP was at issue in Fitzpatrick v. Department of Correction, 102 Mass. App. Ct. 617, 618, 624 (2023).

the judgment as to those claims and remand for further proceedings.

Background.  We summarize the factual allegations of the verified complaint, accepting them as true at this motion to dismiss stage and drawing all reasonable inferences in the plaintiffs' favor.  See Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 676 (2011).

1.  Factual allegations.  The five plaintiffs are serving life sentences at Massachusetts Correctional Institution, Norfolk (MCI-Norfolk or institution), three of them without the possibility of parole.  None of the plaintiffs has been subject to any disciplinary action at times relevant to this case.[4]

The defendant Commissioner of Correction (commissioner) approved the SOP on January 24, 2019, for the stated purpose of "amend[ing]" the "policy" with respect to 103 Code Mass. Regs. §§ 405.00 (2017) governing inmate funds.  Thereafter, two of the other defendant DOC officials issued a memorandum, addressed to all inmates and staff at MCI-Norfolk, summarizing the SOP's new process for disbursements to recipients outside the institution. That memorandum summarized the SOP as follows:

> "[A]ny request for disbursement from account funds for a monetary 'gift' shall be deemed invalid.

---

[4] We acknowledge the allegation of good behavior by all of the plaintiffs but note that their statement regarding "times relevant" to the case is a legal conclusion.

"The inmate may[,] however, order a gift from an outside company/business.  This request must be accompanied by an order form the inmate has obtained from the specific company/business.  The name and address of the intended recipient of the gift shall be listed on the order form.

"If the request for disbursement from funds is to pay a bill, a copy of that bill must be submitted at the time of the request."

The SOP applies to disbursements from an inmate's "personal account."[5]  SOP §§ I, II.

The plaintiff Gordon Haas then wrote several letters to the commissioner, on behalf of the "Lifer's Group Inc." (lifers' group), listing various concerns that prisoners serving life sentences and other "long-termers" had about the SOP's restrictions.[6]  He received responses from other DOC officials that, inferably, did not substantively address the issues he had raised.  One of the responses stated that "all charge slips

---

[5] The verified complaint alleges that DOC "maintains for every prisoner two accounts -- a [p]ersonal [a]ccount for funds to be accessed by a prisoner and a [s]avings [a]ccount for funds to be set aside for when a prisoner leaves the DOC to return to society."  This structure is also reflected in G. L. c. 127, § 48A, and in, e.g., 103 Code Mass. Regs. § 405.07.

[6] A letter from Haas to the commissioner, inferably one of those referenced in the verified complaint, is appended to the plaintiffs' brief.  The letter states that "[l]ifers comprise over 40% of the population at MCI-Norfolk" and that Haas's lifers' group "estimates that over one-third of our members have been regularly sending funds to family members for birthdays and other occasions or just to help out with daily finances."  As it is unclear whether this letter was before the judge, we do not consider it in our analysis.

[i.e., the forms inmates must submit to request disbursements] are reviewed upon receipt. Exceptions may be deemed necessary."

Each of the five plaintiff inmates then requested disbursements from their accounts, in some cases mirroring disbursements made without difficulty in the past, but each of the new requests was denied based on the SOP. Each plaintiff then pursued some form of complaint or grievance, but none obtained any relief.

Haas, for example, submitted two charge slips, requesting that twenty-five dollars from his account be sent to each of two different named individuals in Detroit, Michigan. A DOC employee declined to process the slips. He told Haas that the DOC official responsible for implementing the SOP had instructed that no charge slips for disbursement to individuals should be submitted, because they "would obviously be denied." Haas submitted a complaint form, which was returned to him with the notation that "[p]er [the SOP], you are no longer allowed to send out money to outside individuals. This is DOC wide."

The plaintiff Daniel Holland submitted a charge slip "to send [twenty dollars] to Mellon to be invested in stocks designated for his son upon . . . Holland's death."[7] The request

---

[7] The judge described Mellon as a bank in his decision.

was denied, as was his informal complaint about the denial. Holland submitted a grievance but received no response.

The plaintiff Ricky Alford, on twenty-nine occasions dating back to 2012, had sent funds to his son, who is incarcerated in Louisiana, "to assist his son to purchase hygienic necessities and other items."  After the SOP was issued, Alford requested another such disbursement, in the same manner as before, but this request was denied based on the SOP.  Alford's informal complaint, formal grievance, and internal grievance appeal were likewise denied.  Alford also wrote to the commissioner and received a response stating that "exceptions to [the SOP] are unable to be made."

The plaintiff James Keown submitted a charge slip to send twenty-five dollars to his sister to help pay for his mother to travel from Missouri to visit him.  Keown submitted a second charge slip to send ten dollars to a named Massachusetts State representative "as a donation to his reelection campaign." After waiting five days without receiving a written denial, Keown submitted an informal complaint.  That complaint was denied with the notation, "Per [the SOP] this type of financial transaction is no longer allowed.  MCI-Norfolk is adhering to the policy."

Finally, the plaintiff Martin Lovato had previously been sending funds monthly "to invest in Allete, Inc. to provide a

legacy of stocks for his niece upon . . . Lovato's death."[8] After the SOP was issued, however, Lovato was informed that a charge slip to send funds to Allete, Inc. was denied. He filed an informal complaint, which was denied with a citation to the SOP and the regulation governing inmate funds. Lovato filed a formal grievance, which was denied, and he filed an internal appeal of the denial but received no response. Lovato also wrote to the superintendent of MCI-Norfolk, stating, "unless you possess documentation that implicates Allete, Inc. and myself in some sort of illicit or improper activity, I am respectfully requesting that I be allowed to continue the transactions I engaged in." The superintendent responded that Lovato's request did not comply with the SOP.

In addition to these details about the individual plaintiffs' disbursement requests, the verified complaint alleged that the impetus for the SOP was DOC's "belief that drug transactions within [DOC] are funded through money sent from inmates' personal accounts." Before the SOP was implemented, "any and all charge slips involving a possible misuse of funds were flagged and investigated by correctional staff before said charge slips were processed and funds sent from a prisoner's

---

[8] An Internet search shows that there is an energy company, "Allete, Inc.," that is traded on the New York Stock Exchange. See https://www.allete.com [https://perma.cc/9CR4-A33U].

personal account, including, but not limited to, the [p]laintiffs['] personal accounts."  None of the plaintiffs was ever found to have misused personal funds while in DOC custody, and, prior to the SOP's implementation, none of them was ever denied the use of his personal funds.  None of the plaintiffs has ever tested positive for substance use while incarcerated.

2.  Legal claims.  We briefly review the plaintiffs' legal claims, mindful that "there is no requirement that a complaint state the correct substantive theory of the case," and that "[a] complaint is not subject to dismissal if it would support relief on any theory of law" (citation omitted).  Gallant v. Worcester, 383 Mass. 707, 709-710 (1981).  See Goodwin v. Lee Pub. Sch., 475 Mass. 280, 286 (2016); Gutierrez v. Board of Managers of Flagship Wharf Condominium, 100 Mass. App. Ct. 678, 683 n.10 (2022).  See also Lamoureux v. Superintendent, Massachusetts Correctional Inst., Walpole, 390 Mass. 409, 410 n.4 (1983) (pro se filings interpreted liberally where complaint presents cognizable legal theory); Braley v. Bates, 100 Mass. App. Ct. 259, 262, 263 n.4 (2021) (same, in prisoner's G. L. c. 231A action against State prison official).

The plaintiffs' complaint advanced five claims, only three of which they press on appeal.[9]  First, they claim that the SOP violates 103 Code Mass. Regs. § 405.12, which imposes only a few limited prerequisites that inmates must meet in order to obtain disbursements of their funds.  Second, they claim that the SOP was issued and implemented without legislative authority -- a claim that, as developed in the proceedings on the motion to dismiss, encompassed the argument that the SOP is a "regulation" as defined in G. L. c. 30A, requiring a public hearing before its implementation, and is not within an exemption to that definition.  See Braley, 100 Mass. App. Ct. at 263 n.4.  Third, the plaintiffs claim that the SOP arbitrarily restricts the use of their property, in violation of their due process rights under the United States Constitution's Fourteenth Amendment, enforceable under 42 U.S.C. § 1983.

A judge granted DOC's motion to dismiss the complaint for failure to state a claim upon which relief could be granted.  A

---

[9] The verified complaint also claimed that the SOP (1) violated Haas's and Keown's rights under the First Amendment to the United States Constitution to donate their money to persons, causes, and political campaigns which they support, and (2) violated G. L. c. 127, § 32 (providing that superintendents of DOC institutions "shall treat the prisoners with the kindness which their obedience, industry and good conduct merit").  On appeal, the plaintiffs have not argued either claim.

subsequent motion for reconsideration was denied, and the plaintiffs appealed from both decisions.

Discussion. 1. Propriety of declaratory relief. We reject DOC's threshold argument that, because the plaintiffs (in DOC's view) challenge the individual denials of their requests for disbursements of funds, they may not seek declaratory relief. An otherwise proper request for declaratory relief is not barred merely because a plaintiff also seeks review of an individualized administrative decision.[10] See Grady v. Commissioner of Correction, 83 Mass. App. Ct. 126, 137 n.9 (2013). And here, the plaintiffs' pursuit of declaratory relief is proper because they challenge the validity of the SOP itself, which they allege DOC has consistently and repeatedly relied upon to deny their requests to transfer their money to outside individuals and entities for lawful purposes. "[A] complaint for declaratory relief is an appropriate way of testing the validity of regulations or the propriety of practices involving violations of rights, which are consistent and repeated in nature." Id. at 135, quoting Nelson v. Commissioner of Correction, 390 Mass. 379, 388 n.12 (1983). Nor is an inmate with a grievance required to exhaust the administrative

---

[10] We therefore need not decide whether the plaintiffs actually do seek review of individualized decisions. Their appellate brief, at least, focuses instead on the validity of the SOP.

grievance process before seeking declaratory relief. See Grady, supra at 137 n.9. citing G. L. c. 127, §§ 38F, 38H. Finally, although Grady focused on declaratory judgment actions asserting constitutional claims, declaratory relief may also be sought, as the plaintiffs do here, based on alleged violations of statutes or regulations. See Braley, 100 Mass. App. Ct. at 261-262.

2. Conflict between SOP and regulations. The DOC has promulgated regulations governing inmate funds. See 103 Code Mass. Regs. §§ 405.00. These properly promulgated regulations "ha[ve] the force of law . . . and must be accorded all the deference due to a statute." Borden, Inc. v. Commissioner of Pub. Health, 388 Mass. 707, 723, cert. denied sub nom. Formaldehyde Inst., Inc. v. Frechette, 464 U.S. 936 (1983).

Of course, "courts permit prison administrators considerable discretion in the adoption and implementation of prison policies. . . . However, the limits of such discretion are established by the rules and regulations promulgated by the Department of Correction. Once an agency has seen fit to promulgate regulations, it must comply with those regulations." Royce v. Commissioner of Correction, 390 Mass. 425, 427 (1983). See Dexter v. Superintendent, Massachusetts Correctional Inst., Concord, 88 Mass. App. Ct. 325, 326 (2015) (same; accordingly, DOC "is bound by its 'inmate property' regulation, as promulgated in 103 Code Mass. Regs."). As the Supreme Judicial

Court has recently reiterated in the medical parole context, a court "cannot acquiesce" to DOC's failure to do what is "required by the regulation." McCauley v. Superintendent, Massachusetts Correctional Inst., Norfolk, 491 Mass. 571, 598 (2023). "The regulations must be complied with." Haverty v. Commissioner of Correction, 437 Mass. 737, 763 (2002), S.C., 440 Mass. 1 (2003). See Northbridge v. Natick, 394 Mass. 70, 76 (1985) (State "agency must follow its own regulations even in the face of inconsistent internal guidelines"); Dougan v. Commissioner of Correction, 34 Mass. App. Ct. 147, 148 (1993). And, "[b]ecause they allege that the policy violates DOC regulations, the plaintiffs properly brought this action under the declaratory judgment act." Ivey v. Commissioner of Correction, 88 Mass. App. Ct. 18, 22 (2015).

The particular regulation most relevant here is 103 Code Mass. Regs. § 405.12, which sets forth the relatively simple procedure by which inmates may obtain disbursements of funds from their personal accounts. The inmate need only fill out a "withdrawal/issue slip" -- what the plaintiffs refer to as a "charge slip" -- that includes five items: the date, amount to be withdrawn, purpose, inmate's signature, and staff verification signature. 103 Code Mass. Regs. § 405.12(1). The superintendent of each DOC institution designates an employee responsible for verifying, through the employee's signed

approval, that the request came from the inmate; the employee then submits the slip to the institution's treasurer's office. See 103 Code Mass. Regs. § 405.12(2).  Once the slip is there, the procedure is as follows:

> "The Accounting Clerk/Cashier shall take the withdrawal/issue slip and:
>
> (a) Ensure that inmate has signed the request;
>
> (b) Ensure that the staff member[']s verification signature is present;
>
> (c) Check the inmate account to ascertain there are sufficient funds for withdrawal;
>
> (d) Disburse the funds from the inmate[']s account in accordance with the request."  (Emphasis added.)

Id.  The plain language of this regulation appears to require the accounting clerk, upon receipt of the completed slip and verification of the signatures and the inmate's account balance, to "[d]isburse the funds from the inmate[']s account in accordance with the request."  Id.  The regulation does not restrict the purpose for which a disbursement may be made or the person or entity to whom or which it may be made.

The SOP, in contrast, restricts both.  The SOP states that "[a]n inmate's request for disbursement of his/her inmate account funds for a monetary 'gift' shall be deemed invalid as such monetary disbursements are frequently used for illegitimate purposes."  SOP § II.A.2.  The DOC appears to interpret the SOP's term "gift" broadly, to encompass any transfer of money to

a natural person.  As a DOC official informed Haas, inmates "are no longer allowed to send out money to outside individuals. This is DOC wide."  And as a DOC official informed Keown when he sought a twenty-five dollar disbursement to his sister to help pay for his mother to visit him from Missouri, and a ten dollar disbursement to a State representative for his reelection campaign, "this type of financial transaction is no longer allowed" under the SOP, and "MCI-Norfolk is adhering to the policy."

Does the SOP prohibit all "gifts"?  No.  The SOP states, "Instead, the inmate may submit an order form to purchase a gift for the intended recipient through an outside company/business using funds from the inmate's personal account.  The inmate may submit an order form he/she has obtained from any outside company/business."  SOP § II.A.2.  The SOP also permits an inmate to pay a bill on behalf of an outside person, provided the inmate furnishes DOC a physical copy of the company's or business's bill to that outside person.  SOP § II.A.3.  In either case, DOC then disburses the inmate's funds directly to the company or business.

But the ability to purchase an in-kind gift for a person, or to pay a bill on that person's behalf, is not the same as the ability to transfer money to that person to spend, or save, or invest, or donate, as and when that person wishes.  Under the

regulation, an inmate may request such a direct transfer, and the DOC accounting clerk is required to make it. Under the SOP, a request for such a transfer "shall be deemed invalid" and, at least as the SOP allegedly has been implemented so far, the DOC accounting clerk may not make the transfer. The SOP, far from merely interpreting and implementing the regulation, appears to directly contradict it.

Of course, we do not assume that DOC has heretofore applied the regulation so literally that disbursement requests were approved even where their stated purpose was unlawful or improper.[11] Indeed, the plaintiffs themselves allege that, even before the SOP, "charge slips involving a possible misuse of funds were flagged and investigated by correctional staff before said charge slips were processed and funds sent." We also assume that, even under the SOP, gifts through company order forms -- allowed by the SOP -- are not permitted when used as payment for contraband.

We further recognize that the SOP contains hints that exceptions might be possible. For example, the SOP states that

---

[11] See Commonwealth v. Buccella, 434 Mass. 473, 481 (2001), cert. denied, 534 U.S. 1079 (2002) (court will reject literal interpretation of regulation that would be "utterly absurd" and "clearly not what the [agency] intended"); Commonwealth v. Hourican, 85 Mass. App. Ct. 408, 411 (2014) (same). Cf. Springfield Preservation Trust, Inc. v. Springfield Library & Museums Ass'n, Inc., 447 Mass. 408, 423 (2006) (same, for statute or municipal bylaw).

an institution's deputy superintendent of reentry or her designee is to review all disbursement requests and decide if the request, "whether for purchase of a gift, payment of a bill, or for any other reason, should be approved or denied" (emphasis added). SOP § II.B.1. Also, "[r]equests for disbursements for special matters, such as paying child support obligations, returning bail funds, one-time requests for back-to-school supplies, and expenses related to establishing housing and transportation for release or parole, require additional verification to ensure the legitimacy of the request" (emphasis added). SOP § II.B.5.

So far, however, according to the verified complaint, the plaintiffs have not benefited from these possible exceptions. Their requests have been denied, without any indication that the relevant DOC officials reviewed whether a "special matter" may include contributing to a State representative's reelection campaign, or purchasing an investment to benefit the inmate's family member upon the inmate's death, or assisting the inmate's son incarcerated in another State with the purchase of necessaries, or helping a family member to travel from out of State to visit the inmate. Instead, inmates are informed that "exceptions . . . are unable to be made."

The DOC argues that the SOP is "explicitly authorized" by another provision of the inmate funds regulations that, in DOC's

view, places strict limits on disbursements from inmate accounts. Under that regulation,

> "In accordance with [G. L.] c. 127, § 48A, inmates may expend <u>earned</u> savings and <u>earned</u> personal funds for circumstances of <u>compelling need</u> with the approval of the Superintendent. Such requests shall be submitted in writing to the Superintendent" (emphasis added).

103 Code Mass. Regs. § 405.07(3). Without expressing any further view concerning the correctness of DOC's current position about the meaning and applicability of this regulation, which we recently observed "applies only to 'earned' funds," <u>Fitzpatrick</u> v. <u>Department of Correction</u>, 102 Mass. App. Ct. 617, 623 n.11 (2023), the short answer to this argument is that the SOP on its face applies not just to "earned" inmate personal funds but to <u>all</u> inmate personal funds, including those an inmate receives from outside sources. See, e.g., 103 Code Mass. Regs. § 405.15 ("Individuals and/or organizations may make donations to an inmate by check for deposit in the inmate's personal account"). Neither the regulation DOC relies upon, 103 Code Mass. Regs. § 405.07(3), nor the statute the regulation cites, G. L. c. 127, § 48A, subjects inmates' use of such donated funds to any "compelling need" determination by the institution's superintendent.

More important, nowhere in the ordinary process for disbursement of inmate funds, set forth in 103 Code Mass. Regs. § 405.12 and discussed in detail <u>supra</u>, is there any provision

for a superintendent or any other DOC official or employee to find a compelling need -- or any need at all -- before an inmate's personal funds may be disbursed to outside persons or entities at the inmate's request.  The scope and meaning of the "compelling need" provisions in the regulation and the statute are thus unclear.  And at this early stage of the litigation, we are skeptical that they authorize what the SOP purports to require.

Nothing we have said calls into question the importance of the SOP's stated purpose, to prevent disbursements "related to any illicit or improper activity."  SOP § I.  That plainly encompasses the use of inmate funds to facilitate the introduction of unlawful substances or other contraband into prisons.  Nor do we doubt that DOC's commissioner has the authority, under G. L. c. 124, § 1 (q), to promulgate regulations for that purpose.[12]  Here, however, as in Braley, 100 Mass. App. Ct. at 265, "[f]urther development of the issues

---

[12] Under G. L. c. 124, § 1 (q), the commissioner may

"make and promulgate necessary rules and regulations incident to the exercise of [her] powers and the performance of [her] duties including but not limited to rules and regulations regarding nutrition, sanitation, safety, discipline, recreation, religious services, communication and visiting privileges, classification, education, training, employment, care, and custody for all persons committed to correctional facilities."

discussed is necessary in order to decide the merits of the claim[;] at this stage in the proceeding, the plaintiff[s'] complaint should not have been dismissed."  The plaintiffs have stated a claim that the SOP conflicts with 103 Code Mass. Regs. § 405.12 and to that extent should be declared unenforceable.[13]

3.  SOP as a "regulation" under G. L. c. 30A.  The plaintiffs also claim that the SOP is a "regulation" within the meaning of G. L. c. 30A and therefore must be promulgated under chapter 30A procedures in order to be enforceable.[14]  A regulation "depends for its validity upon compliance with the provisions of law (G. L. c. 30A, §§ 2, 3 and 5) relative to the promulgation of regulations."  Robinson v. Secretary of Admin., 12 Mass. App. Ct. 441, 444 n.6 (1981), and cases cited.  See G. L. c. 30A, § 6.

a.  Definition of regulation; internal management exemption.  Chapter 30A generally defines the term "regulation" and then creates several exemptions.  The general definition is:

---

[13] The verified complaint appears to allege that the SOP conflicts with the regulation on its face, and that the plaintiffs have been injured by the SOP's implementation.  It is for the parties to address, on remand, whether the SOP conflicts with the regulation on its face, as implemented, or both.

[14] Whether the applicable procedures would be those of G. L. c. 30A, § 2 (regulations requiring public hearings), or G. L. c. 30A, § 3 (regulations not requiring public hearings), has not been briefed and need not now be addressed.

> "'Regulation' includes the whole or any part of every rule, regulation, standard or other requirement of general application and future effect, including the amendment or repeal thereof, adopted by an agency to implement or interpret the law enforced or administered by it, but does not include [certain exempted items]."

G. L. c. 30A, § 1 (5).[15] We are to "interpret [the] definition of regulation broadly," Carey v. Commissioner of Correction, 479 Mass. 367, 371 (2018), while recognizing that "[a]gencies intending to fill in the details or clear up an ambiguity of an established policy may issue interpretation or informational pronouncements without going through the procedures required for the promulgation of a regulation" (quotation and citation omitted). Id. at 373.

Here, there is no dispute that the SOP falls within the general definition of "regulation." And, although the SOP is labeled a procedure, "the substance, not the name, [is] to control." Massachusetts Gen. Hosp. v. Rate Setting Comm'n, 371 Mass. 705, 708 n.9 (1977) (agency "letter" or "bulletin" might also qualify as regulation). Rather, the principal dispute here concerns whether the SOP falls within one of the exemptions of

---

[15] This definition, depending in part as it does on the term "agency," must be read together with c. 30A's definition of "agency," as well as related provisions. See G. L. c. 30A, § 1 (2) (defining "agency" and excluding DOC, among others, therefrom); G. L. c. 30A, § 1A (notwithstanding DOC's exclusion from G. L. c. 30A, § 1, definition, DOC remains subject to provisions of G. L. c. 30A, §§ 1-8, including those concerning regulations).

G. L. c. 30A, § 1 (5), that is, clause (b), which exempts from the general definition any "regulations concerning only the internal management or discipline of the adopting agency or any other agency, and not substantially affecting the rights of or the procedures available to the public or that portion of the public affected by the agency's activities."  For convenience, we refer to this as the internal management exemption.

The case law construing this exemption is sparse.  In Commonwealth v. Trumble, 396 Mass. 81, 88-89 (1985), the court held that guidelines promulgated by the Secretary of Public Safety to govern the State police department's conduct of roadside sobriety checkpoints or roadblocks fell within the internal management exemption.  The court reasoned that because "[t]he guidelines are directed solely toward troopers, and instruct them as to the manner in which they are to fulfil their duties," they "concern the internal management of th[e] agency." Id. at 89.  Moreover, the guidelines did not substantially affect the rights of or the procedures available to the public.  Rather, they described the roadblocks' "purpose and operational philosophy," set forth "important procedural and safety considerations," and attempted to ensure compliance with governing constitutional principles.  Id.  "They do not purport directly to regulate public conduct.  The guidelines are simply

an accurate reflection of the rights of the public as set forth in [governing case law]."  Id.

More recently, in Carey, 479 Mass. at 367-368, 371-373, the court held that a new DOC policy subjecting prison visitors to searches by drug-detecting dogs did not fall within the internal management exemption.  "Simply put, the introduction of the new policy substantially affected the procedures available to the public because, prior to the implementation of the policy, visitors to correctional facilities were not subject to dog sniff searches, but now they are."  Id. at 372.  "This change could have a potentially significant impact on the visiting public's experience."  Id.  The court distinguished Trumble on the ground that "it concerned how [the] State police should conduct roadblocks already taking place."  Id.  Moreover, "[t]he fact that [DOC] publicized the new policy" well before its "implementation date is a strong indicator that [DOC] was well aware that implementing canine searches would be of substantial concern to those affected" and did not "concern[] only internal management issues."  Id.

The Carey court also rejected DOC's argument that the policy was merely "intend[ed] to fill in the details or clear up an ambiguity of the regulation governing searches of visitors, rather than to initiate a material change, and that thus the policy is not subject to [G. L. c. 30A]" (quotation and citation

omitted).  Id. at 372-373.  The court acknowledged its prior decisions stating the general principle regarding subregulatory guidance.  See id., citing Arthurs v. Board of Registration in Med., 383 Mass. 299, 313 n.26 (1981); Massachusetts Gen. Hosp., 371 Mass. at 707.  See also G.A. McDonough, Administrative Law and Practice § 12:3 (2d ed. 2016).  But the Carey court recognized that there are limits to that principle, and DOC's dog sniff search policy went beyond those limits.  See Carey, supra at 373.  The court thus concluded:  "An agency's interpretation of its own regulations may trigger [G. L. c. 30A] if that interpretation leads to a rule or policy that meets the [c. 30A] definition of a regulation."[16]  Id.

b.  Application to SOP.  Here, the SOP, although largely phrased as a series of procedures that DOC staff must follow,

---

[16] The Carey court explained that "the purpose of [the administrative procedure act] would be disserved if an agency with a broad statutory command . . . could avoid notice-and-comment rulemaking simply by . . . invoking its power to interpret that statute and regulation in binding the public to a strict and specific set of obligations."  479 Mass. at 373, quoting Electronic Privacy Info. Ctr. v. United States Dep't of Homeland Sec., 653 F.3d 1, 7 (D.C. Cir. 2011).  Compare Atlas Distrib. Co. v. Alcoholic Beverages Control Comm'n, 354 Mass. 408, 414 (1968), where the court held that a particular agency's decision could "reasonably be characterized as a reinterpretation of the reasoning behind the application of existing rules," rather than as itself a regulation requiring promulgation under G. L. c. 30A.  At the same time, the court acknowledged that "it is often difficult to draw a clear and objective line between a regulation and the reasoning behind it."  Atlas Distrib. Co., supra.

imposes new substantive limitations on what inmates may do with their own money.  The SOP thus appears to "substantially affect[] the rights of" all DOC inmates, who are certainly a "portion of the public affected by the agency's activities." G. L. c. 30A, § 1 (5) (b).  The SOP classifies inmate requests for disbursements of money to outside individuals as "invalid," meaning inmates can no longer make such transfers, as they did before the SOP was issued.  Also, among those who can no longer receive such transfers are inmates' family members, another portion of the public affected by DOC's activities.  Cf. Carey, 479 Mass. at 372 (dog sniff search policy "substantially affect[ed] the procedures available to visitors to correctional facilities"; visitors are portion of public affected by DOC's activities).

In addition, the SOP appears to substantially affect "the procedures available" to inmates.  G. L. c. 30A, § 1 (5) (b). The SOP does so by limiting inmates, in the case of gifts, to submitting an order form to purchase a gift for the intended recipient through an outside company or business, using "an order form [the inmate] has obtained from [that] company/business";[17] or, in the case of bills, to paying a bill

---

[17] Although unclear from the SOP itself, the summary memorandum issued to all inmates and staff at MCI-Norfolk states that inmates must use "an order form the inmate has obtained

on behalf of an outside person only if the inmate can furnish a physical copy of the bill.  SOP § II.A.2, 3.  The SOP's procedures thus make it more cumbersome, at a minimum, for inmates to obtain disbursements to provide in-kind assistance to outside persons.  In an era of Internet commerce, it is not self-evident that inmates have access to physical order forms, or access to the Internet to print order forms.  The plaintiffs also plausibly question whether, for example, a transportation company in Missouri will send Keown a bill for advance payment of his mother's travel expenses, or whether a prison canteen in Louisiana will send Alford a bill for his incarcerated son's hygienic necessities.

These are not mere quibbles with minor implementation details.  Rather, the extent of the new procedural burdens the SOP imposes is a factor that may bear on whether the SOP is a regulation.  See Massachusetts Gen. Hosp., 371 Mass. at 707 (agency pronouncement more likely to be viewed as regulation where it "is seen to involve difficulties of compliance").  And

---

from the specific company or business."  There apparently is no room for an inmate to write a letter to the business that gives the information necessary to fulfill the order.

here, as in Massachusetts Gen. Hosp., the extent of the burdens may present questions of fact.[18] See id. at 712-713.

Imposition of these new limits on inmates' transfer of their money, and of these new requirements for what they must do to exercise the options they still have, support a claim that the SOP substantially affects inmates' rights and the procedures they must follow, and thus that the internal management exemption does not apply. Cf. Carey, 479 Mass. at 372 (substantial effect shown where "prior to the implementation of the policy, visitors to correctional facilities were not subject to dog sniff searches, but now they are").

Another factor suggesting that the internal management exemption does not apply is that an MCI-Norfolk official assertedly issued a memorandum explaining the SOP, not merely to staff, but to all inmates. Although this was not a "coordinated multimedia campaign" as in Carey, 479 Mass. at 372, it plainly suggests that the SOP "concern[s] [more than] the internal management or discipline of" DOC. G. L. c. 30A, § 1 (5) (b).

---

[18] In Massachusetts Gen. Hospital, 371 Mass. at 712-713, a hospital claimed that obtaining the data and documentation required by an agency "bulletin" would "seriously burden" it, but the trial testimony did not support that claim. Moreover, some of the harder-to-obtain data was required only when the agency requested it -- a request "which, we should assume, would not be made lightly or unreasonably." Id. at 713. Whether a similar assumption should apply here is an open question.

Finally, the SOP on its face does not merely "fill in the details or clear up an ambiguity of" an established policy (citation omitted).  Carey, 479 Mass. at 372-373.  Instead, the SOP appears to establish new rules, which contradict the regulations already in effect, and which prohibit disbursements that the plaintiffs allege were routinely permitted under those regulations.  We conclude that the verified complaint states a claim, sufficient to survive a motion to dismiss, that the SOP is a regulation and, not having been promulgated as such through G. L. c. 30A procedures, is unenforceable.[19]

4.  Constitutional claim.  The plaintiffs' complaint also claims that the SOP arbitrarily restricts the use of their property in violation of their due process rights.[20]  See Ciampi v. Commissioner of Correction, 452 Mass. 162, 170 (2008) (assuming without deciding that "prisoners have a statutorily

---

[19] We add that this case is unusual; in most instances, it will be clear, without any factual dispute, whether an agency's guidance document merely fills in details or clears up ambiguities in established policies, as opposed to substantially affecting the rights of or the procedures available to that part of the public the agency serves.  And it is desirable that agencies be able to readily determine, without extensive factual inquiries, when a guidance document rises to the level requiring promulgation as a regulation.

[20] Although on appeal the plaintiffs have made no separate First Amendment argument, we recognize that among the various purposes for which they seek to make disbursements to individuals are purposes that may further their speech and associational rights.

protected property interest in the funds in their prison accounts entitling them to due process protection").[21]  "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  Turner v. Safley, 482 U.S. 78, 89 (1987).  See Massachusetts Prisoners Ass'n Political Action Comm. v. Acting Governor, 435 Mass. 811, 819-820 (2002) (MPAPAC) (adopting Turner test for prison regulations and policies); Gaskins v. Silva, 101 Mass. App. Ct. 555, 563 (2022). "Acknowledging the difficulty that prison officials face in the operation of prisons, [the Supreme Judicial Court has] expressly adopted Turner's deferential standard of review for constitutional challenges to prison regulations and policies." MPAPAC, supra at 819-820, citing Cacicio v. Secretary of Pub. Safety, 422 Mass. 764, 769–770 (1996).

The court has "also adopted Turner's four-factor inquiry to determine whether a prison regulation is reasonably related to a legitimate penological interest."  MPAPAC, 435 Mass. at 820. The Turner test asks:

"(1) Is there a valid, rational connection between the regulation and the governmental interest put forward to

_____

[21] See also Massachusetts Prisoners Ass'n Political Action Comm. v. Acting Governor, 435 Mass. 811, 819, 822 (2002) (recognizing that inmates' ability to "contribute their personal funds to candidates and outside organizations," subject to neutral limitations imposed by 103 Code Mass. Regs. §§ 405.00, were means of exercising free speech and associational rights).

justify it, and is the governmental interest legitimate and neutral; (2) do alternative means of exercising the [asserted] right remain open to inmates; (3) will accommodating the [asserted] right have a significant 'ripple effect' on guards, other inmates, and the allocation of prison resources in general; and (4) does an alternative to the regulation exist which would fully accommodate the inmates' rights at de minimis cost to valid penological interests?"

Cacicio, 422 Mass. at 770, citing Turner, 482 U.S. at 89-91.[22]

Importantly, application of the Turner factors sometimes requires factual inquiries. Turner itself was resolved only after a trial, and the Court, in holding the challenged prison regulation invalid, repeatedly referred to the factual record in applying its four-factor test. See Turner, 482 U.S. at 82, 97-99. See also Gaskins, 101 Mass. App. Ct. at 562-564 (affirming invalidation of regulation based on Turner factors as illuminated by summary judgment record); Abdul-Alazim v. Superintendent, Mass. Correctional Inst., Cedar Junction, 56 Mass. App. Ct. 449, 456-458 (2002) (vacating summary judgment for prison officials and ordering summary judgment invalidating

---

[22] We note that Cacicio and subsequent Massachusetts cases, in describing the second and third Turner factors, have referred to "exercising the challenged right" and "accommodating the challenged right" (emphasis added). Cacicio, 422 Mass. at 770. See, e.g., MPAPAC, 435 Mass. at 820; Commonwealth v. Jessup, 471 Mass. 121, 131 (2015); Gaskins, 101 Mass. App. Ct. at 563-564. Turner itself, however, referred to the exercise and accommodation of "the asserted right" (emphasis added), i.e., the right asserted by the inmate, with which the challenged prison regulation was claimed to interfere. Turner, 482 U.S. at 90. See Jessup, supra. We use the clearer phrase "asserted right" herein.

policy, where record evidence did not show policy furthered claimed penological interest, or any adverse impact from accommodating asserted right); Lovell v. Superintendent, N. Cent. Correctional Inst., 26 Mass. App. Ct. 35, 40 (1988) (reversing summary judgment upholding prison directive and remanding for further proceedings where first and fourth Turner factors could not be evaluated solely as matter of law).

The Turner test does not focus solely on the challenged prison regulation or policy.  Inmates' proposed alternatives to the regulation or policy must also be considered, both for their efficacy and for the degree of any adverse impact on valid penological interests.  See Turner, 482 U.S. at 90-91; MPAPAC, 435 Mass. at 820, 822.  Significantly, however, the Turner test "is not a 'least restrictive alternative' test."  Turner, 482 U.S. at 90.  See MPAPAC, 435 Mass. at 820 n.9.  It is a test that is "deferential" to prison administrators.  Commonwealth v. Jessup, 471 Mass. 121, 130 (2015).

Against this backdrop, we conclude that sufficient questions remain, about the implementation both of the preexisting regulation and of the SOP, that extended discussion of the Turner factors here would be premature and unwise. Courts "do not . . . decide constitutional questions unnecessarily or prematurely."  Massachusetts Gen. Hosp. v. C.R., 484 Mass. 472, 488 (2020).  Moreover, DOC has sought to

recharacterize the right the plaintiffs are asserting, and the parties have not briefed the question of how we should go about characterizing that right.  In these circumstances, attempting to apply the Turner test would be an exercise in hypotheticals, and courts "prefer not to pass on [a] constitutional question on a hypothetical basis."  Boston Gas Co. v. Department of Pub. Utils., 387 Mass. 531, 540 (1982).  Without implying any view on the merits of the constitutional claim, we determine only that its dismissal at this stage of the litigation was not warranted. As should be obvious, a decision in the plaintiffs' favor on either of their other remaining claims would make resolution of the constitutional issue unnecessary.

Conclusion.  Insofar as the judgment dismissed the claims that the SOP conflicts with 103 Code Mass. Regs. § 405.12, is invalid because it was not promulgated as a regulation under G. L. c. 30A, and violates the plaintiffs' due process rights, it is reversed and the matter is remanded for further proceedings.  The judgment is otherwise affirmed.

So ordered.